DAVID P. CREED & others[1] vs. KRIST E. APOG & others.[2]

Middlesex.    February 14, 1978. — May 19, 1978.

Present: HALE, C.J., GRANT, & ARMSTRONG, JJ.

*Broker*, Commission. *Contract*, With broker, Performance and breach. *Evidence*, Extrinsic affecting writing. *Practice, Civil*, Costs.

In an action on a contract between a landowner and real estate brokers, by which the landowner agreed to compensate the brokers for their services in obtaining an option agreement only if, as, and when the option was exercised and title passed thereunder, but not otherwise, the brokers were not entitled to an instruction which would have permitted the jury to find for the brokers on the contract if they should find that the brokers had been the "efficient cause" of the eventual sale of the locus even though the sale was not made pursuant to the option agreement. [371–372]

In an action by real estate brokers seeking recovery under a compensation agreement for services provided a landowner in connection with the sale of a large tract of land, the judge did not err in directing verdicts for the landowner on the quantum meruit counts of the complaint where the agreement expressly conditioned the landowner's performance upon the occurrence of events which never happened. [372–373]

In an action by real estate brokers seeking recovery under a compensation agreement for services provided a landowner in connection with the sale of a large tract of land, the judge did not err in excluding testimony from an expert witness as to the proper interpretation of the contract where the language of the contract was clear and unambiguous and did not require or admit of extrinsic explanation. [373–374]

In an action for breach of a compensation agreement, the evidence did not require a finding that the defendant had waived the conditions of the agreement. [374–375]

[1] Robert H. Egan, Edward L. Diehl and Edward Diehl Associates, Inc.

[2] Krist E. Apog and Barbara B. Talkowski as trustees of Imperial Gardens Realty Trust.

In an action for breach of a compensation agreement, the evidence did
     not require a finding that the defendant had acted in bad faith to
     deprive the plaintiffs of their compensation. [375]
A judge did not err in refusing to award a defendant as an item of
     taxable costs under G. L. c. 223, § 122, the expense of obtaining and
     maintaining a letter of credit which a surety company required as
     collateral security for a bond. [376–377]

CONTRACT. Writ in the Superior Court dated August 6,
1970.

The action was tried before *Mitchell, J.*

A motion for costs was heard by *Fine, J.*

*John R. Hally (Susan F. Brand* with him) for the plain-
tiffs.

*Douglas P. Woodlock (Joseph L. Cotter* with him) for the
defendants.

GRANT, J. The plaintiffs seek to recover from the de-
fendants for services performed in connection with the
sale of a large tract of land in Westwood (locus) owned
originally by the defendants Apog and Talkowski as
trustees of the Imperial Gardens Realty Trust and later
by Apog individually. Counts 1 and 2 (brought by Creed)
and 5 (brought by Egan, Diehl and Edward Diehl Associ-
ates, Inc. [Associates]) of the declaration (complaint)
sought recovery pursuant to an express contract between
the parties; counts 3 and 4 (brought by Creed) and 6
(brought by Egan, Diehl, and Associates) sought recovery
in quantum meruit. All parties moved for directed ver-
dicts at the close of the plaintiffs' evidence. The plaintiffs'
motion was denied. The defendants' motion was allowed
as to counts 3 and 4 but denied as to the remaining
counts. The jury returned verdicts for the defendants on
those counts. The plaintiffs have appealed from the ensu-
ing judgments. The defendants have appealed from an
order entered after the judgments denying in part their
motion for costs.

We summarize the evidence most favorable to the
plaintiffs. Creed is a licensed real estate broker; Diehl
and Egan are both associated with the plaintiff Associ-

ates, a firm providing design, planning, site evaluation and related services; Apog is a real estate owner and developer. In 1967 the Lahey Clinic Foundation (Lahey), a group practice of approximately 100 physicians whose principal facilities were then located in Boston, was considering the purchase of property in a suburb of Boston on which to construct a hospital with outpatient facilities and physicians' offices. Creed learned of Lahey's possible interest and told Diehl, who promised to contact Creed if he found a possible site. A month later, in May of 1967, Diehl contacted Apog to ascertain whether he might be interested in selling the locus to Lahey. Apog was. Diehl informed Creed, and in June of 1967 Creed, with the permission of Apog, showed the locus to the president of Lahey, who indicated an interest in purchasing it.

However, Lahey desired that various studies be made to determine whether the locus would be appropriate for Lahey's purposes. Among other matters to be studied were problems of sewage disposal, the availability of utilities, vehicular access to the locus, and parking. Such studies were performed by Diehl, Egan, and Associates with the understanding that Apog would compensate them for their services. In addition, the locus was zoned for single family residential use, and, although a hospital could be built in such a zone under a special permit, Lahey desired certain changes in the Westwood zoning by-law before it might purchase the locus.

In October of 1968, although the zoning by-law had not yet been changed and Lahey was not yet convinced that the locus would be an appropriate site for its facilities, Lahey was sufficiently interested in the locus that it entered into an agreement with Apog and his cotrustee by which they gave Lahey an option to purchase the locus for a price of $1,200,000. Lahey paid the trustees $15,000 upon the execution of the agreement, which provided that by the payment of additional sums of $15,000 at six-month intervals Lahey could extend the life of the

option for a maximum period of three years.[3] Contemporaneously with that agreement Apog entered into a separate written agreement with the plaintiffs (one which the parties agree superseded all previous agreements between them) by which Apog agreed to compensate the plaintiffs for their services in obtaining the option agreement. The relevant provisions of the compensation agreement are set forth in the margin.[4]

By the middle of 1969 Lahey's negotiations with the town concerning a possible change in the zoning by-law had reached an impasse over the question of the payments Lahey, as a tax-exempt institution, might be willing to make to the town in lieu of property taxes. In September of that year Apog, apparently recognizing the possibility that Lahey might not exercise its option, en-

---

[3] Lahey made the payments necessary to keep the option alive at all material times.

[4] "It is mutually understood and agreed, evidenced by my execution of the within document and the assenting thereto by you, that any commission or other compensation owing to you as a result of my entering into said Land Purchase Option, and as an inducement for me to enter into the same, shall aggregate the sum of $100,000.00, to be paid to you, pursuant to the following apportionment *only* if, as, and when the option in said Land Purchase Option is exercised, title passes thereunder and the full consideration therein set forth is paid to me, but not otherwise. Notwithstanding the foregoing, if within three (3) years from the date hereof, title to the premises passes from me to Lahey Clinic Foundation, Inc., under terms and conditions other than as aforesaid, but the consideration is more or less than $1,200,000.00 (exclusive of additional lands set forth in paragraph 6 of the said Land Purchase Option, for which no commission is due to you) the said sum of $100,000.00 payable by me to you, as aforesaid (and the apportionment thereof), shall be proportionately adjusted. Except as aforesaid, you are not entitled to any commission or compensation whatsoever relative to the foregoing land and any and all transactions appertaining thereto.

"The foregoing sum of $100,000.00, if due and payable to you, as aforesaid, shall be paid as follows:

| David P. Creed | $50,000.00 |
| Robert H. Egan | $17,500.00 |
| Edward L. Diehl | $17,500.00 |
| Edward Diehl Associates, Inc. | $15,000.00 |
| Total | $100,000.00 " |

tered into an agreement with Cabot, Cabot and Forbes
Land Company (CC&F) by which Apog gave CC&F an
option to purchase the locus free from all encumbrances
except the option agreement with Lahey. In November of
1969 the Imperial Gardens Realty Trust was terminated,
and title to the locus was transferred to Apog individual-
ly. In November of 1969 and again in January of 1970
CC&F contacted Lahey to determine whether it might be
interested in developing the locus jointly, both for La-
hey's facilities and for commercial purposes. Lahey indi-
cated that it was not interested.

On February 27, 1970, Apog executed an agreement
with CC&F for the sale of the locus and certain adjacent
properties owned by Apog. CC&F entered into this agree-
ment on behalf of an undisclosed corporate customer,
which turned out to be the Gillette Company (Gillette).
The agreement provided that the customer (Gillette)
could purchase the locus for approximately $1,700,000,
together with the adjacent properties for an additional
amount. Apog had the option of requiring that the agreed
upon consideration be paid in the form of real estate of
equivalent value.[5] The agreement authorized Gillette "to
deal with . . . [Lahey] in [Gillette's] sole discretion in order
to acquire the Land Purchase Option[6] or to cause it to be
terminated or surrendered to [Apog], as [Gillette]
chooses." If Gillette's negotiations with Lahey should fail
to result in Apog's owning the land free and clear of the
option by April 6, 1970, the purchase and sale agreement
was to terminate. In addition, the agreement was to ter-
minate if the Lahey option should be exercised by anyone

[5] Such an exchange of properties would (and ultimately did) save
Apog $500,000 in capital gains taxes.

[6] The agreement provided that no matter how Gillette might choose
to structure the transaction, it would have to pay Apog the total
agreed upon consideration. In other words, Gillette could not, by ac-
quiring the Lahey option, require a conveyance of the locus for the
price of $1,200,000 which had originally been agreed to between Lahey
and Apog.

other than Gillette at any time prior to the closing date. Finally, the agreement provided that Apog "agrees to pay the commission to . . . Creed . . . and to . . . Egan . . . Diehl and . . . Associates as provided in an agreement dated October 10, 1968." Gillette immediately began negotiating with Lahey for the purchase of Lahey's option. On April 9, 1970, Gillette and Lahey entered into an agreement by which Lahey would (and did) assign the option to Gillette for $910,000. On June 15, 1970, Gillette released its rights under the option, and Gillette and Apog agreed on the properties Gillette would acquire and transfer to Apog as the consideration for his conveyance of the locus. Gillette thereafter acquired the agreed upon properties, and they were conveyed to Apog in return for his conveyance of the locus to Gillette.

None of the plaintiffs played any role in any of the negotiations or dealings between or among any of Apog, CC&F, Gillette and Lahey which commenced in September of 1969 and culminated in the conveyance of the locus to Gillette. During the fall of 1969 Apog mentioned to Creed that he was talking to CC&F about the locus. In addition, Egan and Diehl heard reports that someone other than Lahey whose identity was unknown to them (although they suspected that CC&F was somehow involved) was interested in purchasing the locus. Creed, Egan and Diehl all testified that in March of 1970 they had questioned Apog concerning the possibility of a sale of the locus to someone other than Lahey, that Apog had assured them that he would honor his agreement to compensate them for their work, and that he had shown them the provision of his agreement with CC&F to the same effect. Thereafter the plaintiffs continued to seek information from Apog concerning his negotiations to sell the locus to someone other than Lahey, as well as reassurances that they would be compensated for their work. In late April, 1970, Apog advised Creed and Diehl that Gillette was to purchase the locus. Creed and Egan both testified that Apog had continued to assure them that

their rights were "fully protected" and that they would be "taken care of." Apog, however, testified that he had not shown any of the plaintiffs any portion of the February agreement between CC&F and himself and that he had never indicated to any of them that they would receive compensation even if the Lahey option should not be exercised.

1. The plaintiffs contend that the trial judge erred in denying such portions of their requests for instructions as would have permitted the jury to find for the plaintiffs on the written compensation agreement if they should find that the plaintiffs had been the "efficient cause" of Apog's eventual sale of the locus to Gillette. The judge did not err in this respect.

It is true, as the plaintiffs argue, that there are cases in which it has been held that a broker may be found to have earned a commission if his activities were the efficient and predominating cause of the sale of the property even though the ultimate purchaser turns out to be someone other than the person with whom the broker dealt. See *Thornton* v. *Forbes*, 326 Mass. 308, 309–312 (1950), on which the plaintiffs place their principal reliance. See also *Dexter* v. *Campbell*, 137 Mass. 198, 200–201 (1884), and *Willard* v. *Wright*, 203 Mass. 406, 408–409 (1909). But the present is not a case in which the owner made a general offer to pay a commission to a broker if he should produce a customer ready, willing and able to purchase the property. Here Creed or Diehl had already produced Lahey as a possible purchaser by the time the parties entered into the compensation agreement, which expressly provided that the plaintiffs should be compensated "only if, as, and when the [Lahey] option . . . is exercised, title passes thereunder and the full consideration therein set forth is paid to [Apog], but not otherwise." That agreement also provided that "[e]xcept as aforesaid . . . [the plaintiffs would] not [be] entitled to any commission or compensation whatsoever relative to the foregoing land and any and all transactions appertaining there-

to." See note 4, *supra*. It is well settled that a property owner may by clear and unambiguous language condition his liability for the payment of a broker's commission on the happening of events beyond the broker's simple production of a customer ready, willing, and able to purchase the owner's property. *Spritz* v. *Brockton Savings Bank*, 305 Mass. 170, 170–171 (1940). *Gaynor* v. *Laverdure*, 362 Mass. 828, 835–836 (1973). *Tristram's Landing, Inc.* v. *Wait*, 367 Mass. 622, 625–626 (1975). 10 Williston, Contracts § 1287, at 961–962, 978 (3d ed. 1967). The language used in the agreement between Apog and the plaintiffs was sufficiently clear and unambiguous as to condition Apog's duty to compensate the plaintiffs upon the happening of the events therein stated. *Goldman* v. *Eisenberg*, 256 Mass. 566, 567 (1926). *Canton* v. *Thomas*, 264 Mass. 457, 459 (1928). *Gaynor* v. *Laverdure*, 362 Mass. at 836. Accordingly, even if it were to be assumed (contrary to everything that appears) that the evidence was sufficient to warrant a finding that the plaintiffs were the predominating, efficient cause of Apog's sale of the locus to Gillette, the plaintiffs were not entitled to receive the compensation provided for in their agreement with Apog unless they proved the occurrence of the events upon which their right to that compensation was conditioned. It is conceded that the Lahey option was never exercised and that title did not pass to Gillette under the option agreement. It follows that the plaintiffs' requests for instructions were properly denied.

2. The judge did not err in directing verdicts for the defendants on two of the quantum meruit counts (nos. 3 and 4) of the complaint. The plaintiffs' sole contention, that the evidence was sufficient to support a finding that they had substantially performed their agreement with Apog, must fail. We need not (and do not) pass on the sufficiency of the evidence or the question whether the doctrine of substantial performance applies to contracts other than those for the construction of buildings (see *Cardell* v. *Bridge*, 9 Allen 355, 356 [1864]; *Denham* v.

*Bryant*, 139 Mass. 110, 111 [1885]; *Casavant* v. *Sherman*, 213 Mass. 23, 26 [1912]; 3A *Corbett* v. *A. Freedman & Sons*, 263 Mass. 391, 393–394 [1928]; *Cobb* v. *Library Bureau*, 268 Mass. 311, 317 [1929]; *Hughes* v. *Rendle Corp.*, 271 Mass. 208, 212 [1930]) because that doctrine applies only to bilateral contracts in which the parties have agreed to exchange performances without making either performance expressly conditional on the other or on the occurrence of a particular event. 3A Corbin, Contracts § 701, at 313–315 (1960). See, e.g., *Hayward* v. *Leonard*, 7 Pick. 181 (1828); *Bowen* v. *Kimbell*, 203 Mass. 364, 369–370 (1909); *Cutter* v. *Arlington Constr. Co.*, 268 Mass. 88, 92–93 (1929).[7] To apply the substantial performance doctrine in a case such as the present, in which Apog's performance was expressly conditioned upon the occurrence of events which never happened, would result in the court's "mak[ing] a contract for the parties" contrary to "[i]ts duty . . . to construe the contract which they fully understood and entered into voluntarily." *Cobb* v. *Library Bureau*, 268 Mass. at 316. Compare *Van Dusen Aircraft Supplies of New England, Inc.* v. *Massachusetts Port Authy.*, 361 Mass. 131, 142–143 (1972); *King* v. *Allen*, 5 Mass. App. Ct. 868, 870 (1977).

3. The plaintiffs called a recognized conveyancer as an expert witness and sought to elicit from him testimony to the effect that at the time the plaintiffs and Apog had entered into the compensation agreement the general rule of law in this Commonwealth was that a broker was entitled to a commission upon producing a customer acceptable to the owner even if that customer thereafter refused to carry out the purchase and sale agreement. The plaintiffs further sought to elicit testimony from the same witness to the effect that an owner could avoid that

---

[7] There is nothing to the contrary in *Dragone* v. *Dell'Isola*, 332 Mass. 11, 13 (1954), which involved a unilateral contract. Contrast the contract considered in *John T. Burns & Sons* v. *Brasco*, 327 Mass. 261, 263 (1951).

result by appropriate language which would condition his liability for the payment of a commission on the customer's actually taking title to the property and paying for it. The judge refused to admit any of the proffered testimony; he also refused to instruct the jury in accordance with either of the foregoing propositions.

We find it unnecessary to recite the reasons now advanced in support of the desired testimony and instructions. The plaintiffs concede that the language of the October, 1968, agreement which conditioned the payment of their compensation on the exercise of the Lahey option and the passage of title thereunder is clear and unambiguous. That language did not require or admit of extrinsic explanation. See *Robert Indus. Inc.* v. *Spence,* 362 Mass. 751, 754 (1973); *Johnson* v. *Worcester Business Dev. Corp.,* 1 Mass. App. Ct. 527, 529 (1973); *Sullivan Bros. Clothing Inc.* v. *North Dartmouth Joint Venture,* 3 Mass. App. Ct. 778, 778–779 (1975). Its proper interpretation was a matter of law for the judge. *Tri-City Concrete Co.* v. *A.L.A. Constr. Co.,* 343 Mass. 425, 427 (1962), and cases cited. *Daley* v. *J.F. White Constr. Co.,* 347 Mass. 285, 288 (1964). As the conditions set out in the compensation agreement had not been satisfied, the judge was correct in instructing the jury that they could not find for any of the plaintiffs unless they should find that Apog had waived those conditions or that there had been bad faith on his part.

4. The plaintiffs argue that the trial judge erred in denying their motion for directed verdicts and their subsequent motion for judgments notwithstanding the verdicts. Their contentions are that as matter of law the evidence required findings (a) that Apog had waived the conditions of the compensation agreement and (b) that he had acted in bad faith to deprive the plaintiffs of their compensation by entering into negotiations with CC&F and Gillette.

a. The evidence did not require a finding that Apog had waived those conditions. The conflicts in the evidence

which have already been summarized (*supra* at 370-371) raised a disputed question of fact as to whether there had been a waiver, and the judge could not properly have directed a verdict for any of the plaintiffs on that question.

b. Nor did the evidence require a finding that Apog had acted in bad faith in negotiating with CC&F and Gillette. The jury need not have found that Apog's negotiations with Lahey were "plainly and evidently approaching success" (*Brooks* v. *Gregory*, 285 Mass. 197, 205 [1934]). To the contrary, they could have found, on the basis of the testimony of Lahey's president, that Lahey and the town of Westwood were in deep disagreement in their negotiations concerning an amendment of the town's zoning by-law, without which Lahey would not exercise the option. Given that disagreement, the jury could also have found that it was only prudent for Apog to consider the possibility of selling the locus to someone else, as Creed himself suggested in a contemporaneous memorandum to Apog. Apog had engaged the plaintiffs only for the purpose of assisting in his negotiations with Lahey, and he was not required to engage them for the purpose of attempting to secure an alternate buyer. There was not evidence that any of the plaintiffs had introduced either CC&F or Gillette into the situation or that Lahey had done so. In short, it was open to the jury to conclude that Apog had entered into negotiations with CC&F and Gillette in good faith rather than for the purpose of obtaining the results of the plaintiffs' efforts without paying for them. See *Elliott* v. *Kazajian*, 255 Mass. 459, 462, 464 (1926); *Dragone* v. *Dell'Isola*, 332 Mass. 11, 13 (1954); *Malloy* v. *Coldwater Seafood Corp.*, 338 Mass. 554, 562–563 (1969). Contrast *Siegel* v. *Lowe*, 327 Mass. 154, 155–156 (1951); *Turner* v. *Minasian*, 358 Mass. 425, 429–430 (1970). The question of Apog's good or bad faith was for the jury, not the judge, and there was no objection to the instructions actually given on that question.

5. Upon the commencement of this action the plaintiffs caused certain funds of the defendants to be attached on trustee process. The defendants procured the dissolution of the attachment by filing a bond with corporate surety pursuant to G. L. c. 175, § 105, and c. 223, § 120. In order to maintain the bond in effect until its release by agreement of the parties following the entry of the judgments, the defendants paid $5,580 in premiums on the bond and $19,500 in charges for a bank letter of credit which the surety company required as collateral security for the bond. Pursuant to G. L. c. 223, § 122,[8] a judge[9] awarded the defendants as an item of taxable costs the $5,850 in premiums which they had paid for the bond, but she refuses to allow as such a cost the expense of obtaining and maintaining the letter of credit. The defendants appealed. We find no error.

The defendants' motion for the allowance of that expense is grounded on Mass.R.Civ.P. 54 (d), 365 Mass. 821 (1974), which provides that "[e]xcept when express provision therefor is made either in a statute of the Commonwealth or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs." It is now settled that that rule "does not operate to change preexisting law in the Commonwealth as to costs." *Broadhurst* v. *Director of the Div. of Employment Security*, 373 Mass. 720, 721–723 (1977). It is common ground that there is no statutory provision, common law or rule of court which expressly authorizes the taxation of the desired expense as costs. We have carefully considered all the arguments and authorities advanced by the defendants in support of the desired taxation and find no warrant for departing from the "general rule in Massa-

---

[8] "If the attachment is dissolved and the defendant prevails, his costs shall include the fees of the magistrate and the premium or premiums paid for the bond dissolving such attachment, if it be a surety company bond."

[9] A different judge from the trial judge.

chusetts [that] a litigant must bear his own expenses except in so far as (1) a statute permits awards of costs . . . or (2) a valid contract or stipulation provides for costs, or (3) rules concerning damages permit recovery of costs." *Fuss* v. *Fuss (No. 1)*, 372 Mass. 64, 71 (1977). Compare *Broadhurst* v. *Director of the Div. of Employment Security*, 373 Mass. at 722.

> *Judgments affirmed.*
> *Order as to costs affirmed.*