ANGELA BONIN & another[1] vs. CHESTNUT HILL TOWERS
REALTY COMPANY & others.[2]

Suffolk.   December 9, 1981. — June 22, 1982.

Present: ARMSTRONG, PERRETTA, & KASS, JJ.

*Broker*, Commission.   *Contract*, With broker.   *Securities*, Interest in
limited partnership.

In the circumstances, a real estate broker who had been engaged to find
a buyer for certain real property and who under the agreement with
the owner was specifically precluded from dealing with persons who
would arrange a sale of limited partnership interests in the property
was not entitled to a broker's commission for having introduced the
owner to an individual who was subsequently employed by the owner
to arrange a sale of limited partnership interests in the property.
[68-75]

CIVIL ACTION commenced in the Superior Court Depart-
ment on December 7, 1978.

The case was tried before *Keady*, J., a District Court
judge sitting under statutory authority.

*Richard W. Renehan (Michael S. Greco & Lizbeth Lyons*
with him) for Chestnut Hill Towers Realty Company &
others.

*David G. Hanrahan* for First Star Realty Corp.

*Lawrence H. Adler (Richard D. Bickelman* with him) for
Angela Bonin.

KASS, J.   With a fine touch for understatement the Su-
preme Judicial Court has observed on two occasions that the
relationship and obligations running between real estate
owners and brokers have been "the subject of frequent liti-
gation." *Henderson & Beal, Inc. v. Glen*, 329 Mass. 748,

---

[1] First Star Realty Corp.

[2] Joseph Carabetta and Carabetta Enterprises, Inc., as they are general
partners of Chestnut Hill Towers Realty Company.

751 (1953). *Tristam's Landing, Inc.* v. *Wait,* 367 Mass. 622, 628 (1975). A significant share of the cases raise the question: who made the deal, or, in the language of the law, who was the efficient cause of the sale? See, e.g., *Gleason* v. *Nelson,* 162 Mass. 245 (1894); *Carnes* v. *Finigan,* 198 Mass. 128 (1908); *Nichols* v. *Atherton,* 250 Mass. 215 (1924); *Palmer* v. *Cherney,* 270 Mass. 551 (1930); *Pacheco* v. *Medeiros,* 292 Mass. 416 (1935); *Chisholm* v. *McCarthy,* 325 Mass. 72, 74 (1949); *Turner* v. *Minasian,* 358 Mass. 425 (1970).

This old and much asked question receives a contemporary twist in the case before us. May real estate brokers be entitled to a commission for sale of property if a person whom they introduced to the owner is subsequently employed by the owner to arrange a "syndication," i.e., a sale of limited partnership interests in the real estate venture?

The claim for a commission was tried to a jury which returned a verdict of $600,000 for the plaintiffs, upon which judgment entered. The trial judge denied the defendants' motion for judgment notwithstanding the verdict. Mass.R. Civ.P. 50(b), 365 Mass. 814 (1974).[3] In motions for judgments notwithstanding the verdict, as in motions for a directed verdict, courts are limited to inquiring whether, when all the evidence is considered most favorably to the plaintiff, "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." *Simblest* v. *Maynard,* 427 F.2d 1, 4 (2d Cir. 1970). *O'Shaughnessy* v. *Besse,* 7 Mass. App. Ct. 727, 728-729 (1979). See *Kenny* v. *DiCenso,* 10 Mass. App. Ct. 835 (1980).

---

[3] The defendants made a timely motion for a directed verdict, which the trial judge denied. By agreement, neither side rested until all the evidence was concluded. The trial was a long one and the judge wisely gave the case to the jury, leaving the question of whether there was sufficient evidence to get to a jury to a motion for judgment notwithstanding the verdict. See *Soares* v. *Lakeville Baseball Camp, Inc.,* 369 Mass. 974, 975 (1976).

Here the evidence, as might be expected, was conflicting. Taking the evidence most favorably to the plaintiffs, the jury could have found the following: Upon the initiative of Angela Bonin, whom it had recently hired, First Star Realty Corp. (Star) obtained permission from Joseph Carabetta (Carabetta), to list for sale real estate owned in Newton by a limited partnership called Chestnut Hill Towers Realty Company (the Partnership). Carabetta had authority to make decisions for the Partnership.[4] Star specialized in acting as a broker for the sale of property for investment purposes.

At the time these events occurred early in January, 1977, the property in question was in the early stages of construction. Called Chestnut Hill Towers, the development consisted of 428 apartments in two buildings located on an eighteen-acre site, together with certain amenities such as an outdoor swimming pool, tennis courts and some covered parking.[5] This substantial project was financed through a mortgage insured by the United States Department of Housing and Urban Development.[6]

Star's principal officer, Leonard Abramson, arranged to have Carabetta's accountant, Michael Fiondella, meet with a prospective customer, Paul Slater, for the purpose of exploring Slater's interest in buying the project. That meeting occurred on January 27, 1977, in Slater's office and was a fateful event so far as this litigation is concerned. Slater had invited three business associates to the meeting, including a George Katz whom Slater brought to the meeting because of "tax ramifications."

The meeting was not fruitful. It had been a condition of the Partnership's engagement of Star that it produce a buyer,

---

[4] The general partner of the Partnership was Carabetta Enterprises, Inc., of which Carabetta was the chief executive officer.

[5] Including outdoor parking, there were spaces for 642 cars.

[6] The amount of the mortgage was $18,881,800 and the insurance was pursuant to § 221(d)(4) of the National Housing Act. 12 U.S.C. § 17151 (1976).

i.e., someone who would purchase the property in the conventional sense of taking delivery of a deed in exchange for the price to be paid. Introduction to "syndicators," by which the parties meant persons who would solicit investment in the Partnership by high-bracket taxpayers, was expressly precluded because Carabetta and Fiondella were already dealing with several syndicators. Star had communicated that limitation to Slater. Nonetheless, Katz, after a quick review of figures made available by Star, said that the project was of no interest to the Slater group as an outright purchase, but had considerable romance as an object of a syndication. Fiondella bridled; he grumbled to Bonin that he had been brought to the meeting under false pretenses. Bonin reminded Katz that the subject of the meeting was acquisition, not a syndication. The meeting broke up with an exchange of business cards, should anyone have further interest.

Notwithstanding Fiondella's rebuff, Katz's interest in the project was much excited. The very night of the meeting with Slater, Katz called Bonin while she was at a dinner party to express his enthusiasm. During that conversation, Bonin berated Katz for talking up syndication at the meeting, that this had caused her to lose credibility and had made her feel foolish. Some telephone conversations between Bonin and Katz followed. She put them at eight or ten in number; he said there were three. At all events, the last call was in May, 1977, when Katz said he had lost interest in Chestnut Hill Towers.

Meanwhile Bonin and others at Star sought to interest other buyers. The engagement of Star as a broker and the "sale only" limitation had been oral. So as to enable Star to cultivate a customer name Finard, Fiondella on March 9, 1977, sent partnership tax projections (i.e., a summary of tax losses available from the project) accompanied by a transmittal letter which contained the sentence: "It is our understanding that any sale by CEI [Carabetta Enterprises, Inc.] will be a 100% sale with no guarantees by CEI." Five weeks later, on April 16, 1977, Fiondella, in writing, asked

that Bonin return the tax projections and instructed her that the property was no longer for sale "unless authorized in writing" by Carabetta. Fiondella's efforts to keep things in writing had short-lived success; Bonin went to see Carabetta and received at least tacit authority to bring propositions to him. She wrote to Fiondella that she had "spoken to Joe Carabetta at length about the status of his project and will certainly comply with his guidelines."

Although those guidelines were that Star was limited to procuring a customer who would buy the property,[7] it was open to the jury to conclude that the guidelines were expanded to allow Star to deal with persons who would buy the property for the purpose of thereafter syndicating it, i.e., selling limited partnership interests in the new owner. This could be inferred from negotiations carried on in July with one Franklin Simon and a real estate firm called Equity Management Group, Inc. Those negotiations ended in rejection of the propositions made.

After its suspension in May, Katz's interest in the Chestnut Hill project was rekindled. Katz said this came about because he was consulted by an accountant named Kostin, who was working with one Robert Tracy to construct an attractive proposal for the sale of limited partner interests. On the assumption that the Tracy proposal would not be successful Katz injected himself into the picture by sending a mailgram to Carabetta on August 16, 1977, proposing his firm, Private Investment Placements, "can give you $3 million as investment in Chestnut Hill." There was evidence, albeit oblique, from which the jury could have concluded that Katz had been dealing with Fiondella as early as April. Both at trial disavowed contact between each other from January 27, 1977, to the following August.

---

[7] Bonin, for example, wrote to Carabetta on April 29, 1977: "Dear Joe: Finally we believe we have what we've been seeking . . . a cash buyer who will meet your terms; who is *not* interested in any kind of syndication; who is *not* a builder; who needs great tax shelter" (emphasis in original).

Events then moved in Katz's favor. On November 16, 1977, his firm, Private Investment Placements ("PIP"), concluded a letter agreement with Carabetta and Carabetta Enterprises, Inc., whereby PIP was appointed an exclusive agent to "use [its] best efforts to sell limited partnership interests" in the Partnership. Under the agreement the net proceeds from investing limited partners were not to be less than $2,950,012. By the end of the year twenty-six investing limited partners had subscribed to an amended limited partnership agreement on terms which did not vary materially from the November 16 agreement. A private placement memorandum prepared for PIP conformably with Rule 146 of the Securities and Exchange Commission of the United States disclosed that gross fees of $299,988 would be paid to PIP should the offering of securities be successful.

Bonin had begun to sense that something was afoot in connection with the Chestnut Hill Towers and soon learned it was a syndication by Katz. On December 1, 1977, she wrote to Katz: "I'm very pleased at the progress you are making in your activity re: the purchase of Chestnut Hill Gardens [sic] which we brought to your attention during our meeting with Paul Slater . . . ." Katz was not in the least pleased to hear from Bonin. His response, dated December 7, 1977, was cold and ungenerous, e.g., "[W]e require nothing from you and consider you as a total stranger to this transaction." Carabetta followed up on December 22, 1977, with a letter to Bonin which also brushed her off. Once more, on December 30, 1977, Bonin wrote to Katz, restating that she had introduced him to the property. "I think," her letter concluded, "if you and I and Mr. Carabetta sit down, we could bring this matter to a satisfactory conclusion." Carabetta's lawyer responded that "[T]he Company does not see any value to a meeting." That view of the matter was shown by the subsequent jury verdict to be demonstrably myopic.

The plaintiffs stake their case on the familiar, though elusive, rule that a broker, "in the absence of special circumstances is entitled to a commission if he produces a customer

ready, able, and willing to buy upon the terms and for the price given the broker by the owner." *Henderson & Beal, Inc.* v. *Glen*, 329 Mass. at 751. *Gaynor* v. *Laverdure*, 362 Mass. 828, 831-832 (1973). *Tristam's Landing, Inc.* v. *Wait*, 367 Mass. at 629. It is open to an owner to limit the circumstances in which a commission is to be paid "beyond the broker's simple production of a customer ready, willing, and able to purchase the owner's property." *Creed* v. *Apog*, 6 Mass. App. Ct. 365, 372 (1978), modified on another point, 377 Mass. 522 (1979). See to the same effect *Spritz* v. *Brockton Sav. Bank*, 305 Mass. 170, 170-171 (1940); *Tristam's Landing, Inc.* v. *Wait*, 367 Mass. at 625-626; 10 Williston, Contracts § 1287, at 961-962, and § 1287A, at 978 (3d ed. 1967).

Generally, the mere introduction of a prospect to a property does not earn a broker's commission. *Whitcomb* v. *Bacon*, 170 Mass. 479, 481 (1898). *Bradley* v. *Donohue*, 343 Mass. 774, 774-775 (1961). See *Ebert* v. *Haskell*, 217 Mass. 209, 210-211 (1914) (contrasts duty of middleman with broker). The evidence must go far enough to justify a finding that the broker's services were the efficient or effective means of bringing about the actual sale. *Kacavas* v. *Diamond*, 303 Mass. 88, 92 (1939). But if a broker introduces a seller to a customer who buys, or interests a buyer in a property which he thereafter buys, that may be the efficient or effective means of bringing about a sale if that is all the seller asks the broker to do, see, e.g., *Sherman* v. *Briggs Realty Co.*, 310 Mass. 408, 412-413 (1941), or if the seller thereafter excludes the broker from subsequent negotiations, see *McEvoy* v. *Ginsberg*, 345 Mass. 733, 735 (1963), particularly in such fashion as to deceive the broker and to bar him from earning his commission. See *Corleto* v. *Prudential Ins. Co. of America*, 320 Mass. 612, 616-617 (1947); *Chisolm* v. *McCarthy*, 325 Mass. 72, 74 (1949). *Turner* v. *Minasian*, 358 Mass. 425, 429 (1970). Whether the claimant for a broker's commission is the efficient cause of a sale is for the jury to decide if the claimant introduces evidence from which the jury may infer that he was em-

ployed, that the person whom he introduced to the property bought it upon terms not materially different from those set by the seller, and that no new forces intervened to break the causal chain between the broker's efforts and the sale. *Holton* v.. *Shepard*, 291 Mass. 513, 516 (1935). The terms initially proposed and those finally adopted need not be identical. *Stuart* v. *Valsom*, 249 Mass. 149, 152 (1924).

In the application of these principles the plaintiffs in the instant case needed to overcome four major hurdles: (1) the restriction on their initial engagement, i.e., that they were authorized to find a buyer and were specifically precluded from dealing with persons who would arrange a sale of limited partnership interests; (2) the failure by Bonin or anyone else at Star to pursue Katz; (3) the rekindling of Katz's interest by the intervening cause of his meeting in August with Tracy, who had an exclusive agreement with Carabetta to syndicate the project but could not make it move, thus informing Katz that Carabetta might now find his services welcome; and (4) the defense that a sale of the real estate never occurred.

As to the first obstacle, the terms of employment, the plaintiffs cannot seriously contest that at the meeting of January 27, 1977, when Katz learned the property was for sale, Star and Bonin were expressly barred from dealing with syndicators. For that very reason the meeting turned chilly when Katz spoke to the merits of syndication and Bonin, as we have seen, reprimanded him for raising the subject. The plaintiffs, however, undertook to show that their dealings with Kosow (the principal of Equity Management Group) and Simon reflect that Carabetta eased up on the syndicator prohibition. Neither Kosow nor Simon, however, proposed to sell limited partnership interests for Carabetta or the Partnership; rather each proposed to buy the property conditioned on his ability thereafter to syndicate the property for his own account. There was, in any event, no contact between Star or Bonin and Katz after the

time of the purported broadening of the engagement.[8] Although, when the evidence conflicts, it is for the jury to decide what the agreement of the parties was, *Boyle* v. *Goldenberg*, 267 Mass. 24, 27 (1929); *McEvoy* v. *Ginsberg*, 345 Mass. at 736, there must be some evidence that the terms of the engagement were in doubt so that the jury has a question to resolve. We view the evidence here as requiring the conclusion that, as between the plaintiffs and Katz, the plaintiffs were restricted to producing someone who would buy the property from the Partnership. Cf. *Holton* v. *Shepard*, 291 Mass. at 520-522; *Kacavas* v. *Diamond*, 303 Mass. at 92-93. *Bradley* v. *Donahue*, 343 Mass. at 774.

As to the second obstacle, there was evidence from which a jury might infer that Bonin not only made Katz aware that the Chestnut Hill property was for sale, but that she furnished him with information about the project and attempted to keep him interested in it.

As to the third obstacle, the testimony of Carabetta, Fiondella and Katz, the timing of his first visit to the project, as well as the documentary evidence set the renewal of Katz's interest in August. If there was a break in the chain, the plaintiffs cannot recover. See *Kacavas* v. *Diamond*, 303 Mass. at 92-93, in which negotiations between the customer and a first broker lapsed and were resumed because of the intervention of a second broker. The jury were not, however, required to believe the defendants' testimony and might have believed the site visit and documentary evidence to be contrived. The only evidence that Fiondella may have met with Katz earlier (in April) was some confused testimony given by Carabetta at a deposition; that deposition testimony he repudiated at trial. Cf. *Sullivan* v. *Boston Elev. Ry.*, 224 Mass. 405, 406 (1916). While it is a close question in this case, the weight of authority in broker's commission cases is to leave the chain of causation leading

---

[8] Had Star in fact been employed to find a syndicator for Carabetta, it is hard to imagine that Bonin would not have given her dealings with Katz another turn.

to a sale to the jury. We cannot say it was error to leave it to the jury in this case. Contrast *Kacavas* v. *Diamond, supra*; *Bradley* v. *Donahue*, 343 Mass. at 774.

The fourth obstacle for the plaintiffs is to establish that a sale occurred. We think that none did. The form or identity of the purchaser is not material, i.e., the substitution for the original customer of a related trust, partnership, joint venture or corporation. Compare *Thornton* v. *Forbes*, 326 Mass. 308, 311-312 (1950); *Kenny* v. *DiCenso*, 10 Mass. App. Ct. 835 (1980). But here no sale of the real estate took place. Rather there was a sale of limited partnership interests through the agency of Katz's firm, PIP. Limited partnership interests are personal property, G. L. c. 109, § 18, and their sale is treated as a sale of securities. *Bartels* v. *Algonquin Properties, Ltd.*, 471 F. Supp. 1132, 1146 (D. Vt. 1979). See also *United Housing Foundation, Inc.* v. *Forman*, 421 U.S. 837, 852 (1975) (security defined as "an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others").

Limited partnerships as a vehicle to pass tax losses through to high tax bracket investors have burgeoned in the past decade. Because of this relatively recent usage, the decisional literature is sparse. The distinction between the sale of securities and the sale of real estate was recognized in *Sunshine* v. *Mid-South Constr., Inc.*, 496 S.W.2d 708 (Tex. Civ. App. 1973), in which the court said of the plaintiff's activity in selling limited partnership interests: "In doing so he was not acting as a real estate broker." *Id.* at 711. Similarly in *McGaughey* v. *Fox*, 94 Cal. App. 3d 645, 649-650 (1979), the court concluded that the sale of investment units in a limited partnership was not the work of a real estate broker and precluded recovery against a statutory fund established for the benefit of persons defrauded by real estate brokers.[9] Failing to be licensed as a real estate broker

---

[9] In 1977, California amended § 10131.3 of its Business and Professions Code to include the sale of securities in real estate limited partnerships in

did not preclude recovery of a commission for the sale of an equity interest in a limited partnership which owned a shopping center because "the investment comes closer to the definition of a security in Chapter 80A of the Minnesota statutes, which has its own registration and broker licensing requirements." *CRI, Inc.* v. *Watson,* 608 F.2d 1137, 1143 (8th Cir. 1979). In all these cases, it may be noted, the claim arose out of the sale of the securities, an activity in which Star and Bonin did not participate.

The distinction is more than a formal one. What PIP undertook to do was to use its best efforts to sell partnership interests. PIP, of which Katz was one of two equal partners, rendered services to the defendants. It located twenty-six strangers who satisfied the "rich and smart" criteria of Rule 146 of the Securities and Exchange Commission. To do so required them to be registered security dealers. 15 U.S.C. § 77b(12) (1976). G. L. c. 110A, § 201. In making the offering, PIP was responsible for the preparation of an offering memorandum describing details of the project, the risks involved, the source and application of funds, and the projected income and loss. In addition to fulfilling these technical requirements, the securities dealer would of course solicit prospects from his clientele.

The case might stand on a different footing had PIP underwritten the offering, i.e., agreed to buy all limited partnership investment units which were not purchased by third parties. Then Katz's firm, as the buyer of last resort, might (although we do not so decide) be seen as a buyer. Similarly one could imagine transactions involving the purchase of interests in a partnership, corporation or other business entity which masked a purchase of the underlying real estate. This might have been the case had Katz and some business associates themselves purchased the dominant interest in the Partnership. See *Thornton* v. *Forbes,* 326 Mass. at 311-312; *Kenny* v. *DiCenso,* 10 Mass. App. Ct. 835 (1980).

the definition of work done by a real estate broker, provided no more than 100 persons own beneficial interests. See Cal. Corp. Code § 25206 (Deering 1979).

The case of *Holton* v. *Shepard*, 291 Mass. 513 (1935), is instructive by analogy. There Shepard engaged Holton to find a customer for his department store business, either by a sale of assets or a sale of the stock of the corporation which operated the business. Holton, the broker, initiated negotiations with Edmund Seymour & Co., Inc., and directed Shepard's attention to Seymour. Ultimately Shepard struck a deal with Sawyer Brothers, Inc., whereby Sawyer Brothers would organize a holding company to buy the stock of Shepard stores. Subsequently Sawyer Brothers turned to Seymour for financing assistance. Seymour borrowed funds for one-fifth of the purchase price for Shepard stores and joined with Sawyer in an underwriting agreement to sell stock of the holding company. Those transactions, the court determined, were not the equivalent of a sale by Shepard to Seymour. *Id.* at 516-522. The elements of sale to Katz are more remote in the case at bar since Katz took neither an underwriter nor an investor position. He and his partner in PIP received as part of their compensation a special limited partnership interest entitling them to certain distributions in the event of the sale or refinancing of the Partnership's property, but allocated no profits or losses from operation of the Partnership business.

Nor did the transaction have the attributes of a sale of the property for Carabetta Enterprises, Inc., and Carabetta individually. Under the partnership agreement, as amended in connection with the sale of limited partnership interests, Carabetta Enterprises, Inc., was obliged to continue as a general partner and Carabetta became a general partner in his own name. In addition to the statutory liabilities of general partners (see G. L. c. 109, § 9), the general partners assumed certain contractual liabilities of which the most onerous was an obligation to provide the Partnership with the first $600,000 required to meet operating expense deficits, should they occur.

Perhaps Katz would never have heard about the Chestnut Hill project but for his encounter on January 27, 1977, with Bonin and Abramson. That itself is an unlikely proposition

since it was not disputed that Tracy's accountant, Kostin, mailed detailed information about the property and projections of profit, loss and tax consequences to Katz on July 19, 1977. In any event, every transmission of useful information is not compensable. The record does not support a promise to pay a finder's fee to the plaintiffs should they point the defendants to a promising syndicator, nor was there any attempt to try the case on that premise. Primarily the difference between brokers and finders is that brokers introduce and negotiate with customers and finders merely identify a business opportunity. Thus, syndicators might well contract to pay a finder's fee for syndication opportunities brought to their attention. See *Davidson* v. *Robie*, 345 Mass. 333, 337-340 (1963), and particularly 338 n.6; *Anderson* v. *Gewecke*, 36 Ill. App. 3d 170, 175 (1976); *Ruskin* v. *Rodgers*, 79 Ill. App. 3d 941, 958-961 (1979).

That Bonin would think herself frozen out and ill used was predictable to the most casual student of human nature. Katz and Carabetta's dealings with her do not stand as a model of decency, wisdom and candor. The fact remains that PIP's broker-dealer services in the sale of securities did not constitute a purchase of the Partnership's property for $3,000,000 net to the seller.

On the view we have taken of the case there is no occasion to consider the other claims of error made by the defendants.

The judgment on count I is reversed, and judgment is to be entered thereon for the defendants Chestnut Hill Towers Realty Company, Joseph Carabetta and Carabetta Enterprises, Inc.

*So ordered.*