ANGELA BONIN & another[1] vs. CHESTNUT HILL TOWERS
REALTY CORP. & others.[2]

Suffolk.  February 10, 1983. — May 23, 1984.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Broker,* Commission.  *Contract,* With broker.

The evidence in an action by a real estate broker against the owner of a parcel
of commercial property required a finding that, under the terms of the
broker's original agreement with the owner, the broker was limited to
producing a buyer who would take a conveyance of the property, and
that she was precluded from dealing with persons who would arrange
the sale of limited partnership interests in it. [64-66] ABRAMS, J., with
whom LIACOS, J., and NOLAN, J., join, dissenting.

In an action by a real estate broker to recover a commission allegedly due
from the owner of a parcel of commercial property, even if the jury
would have been warranted in finding that the owner, by the conduct
of its general partner in entering into certain negotiations, had expanded
the broker's authority to include efforts not only to find a purchaser of
the property but also to find a potential syndicator, there was no evidence
that the broker's efforts had led to a particular syndication of the property
by a syndicator who, after initial meetings, had communicated to her
his lack of interest in the property. [66-69] ABRAMS, J., with whom
LIACOS, J., and NOLAN, J., join, dissenting.

In an action by a real estate broker to recover a commission allegedly due
from the owner of a parcel of commercial property, the evidence would
not have warranted the jury in finding that the owner had dealt secretly
with a potential syndicator of the property or had otherwise acted to
prevent the broker from performing under her contract with the owner
which, during the relevant times, limited her to finding a buyer who
would take a conveyance of the property. [70-71] ABRAMS, J., with
whom LIACOS, J., and NOLAN, J., join, dissenting.

[1] First Star Realty Corp. (Star). Star was originally named as a defendant,
and later asserted cross claims to coincide with Bonin's claims against the
defendants.

[2] Joseph Carabetta and Carabetta Enterprises, Inc., as they are general
partners of Chestnut Hill Towers Realty Corp.

CIVIL ACTION commenced in the Superior Court Department on December 7, 1978.

The case was tried before *Keady, J.,* a District Court judge sitting under statutory authority.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*David G. Hanrahan* for First Star Realty Corp.

*Robert M. Bonin* for Angela Bonin.

*Richard W. Renehan* (*Lizbeth Lyons* with him) for the defendants.

LYNCH, J. A Superior Court jury awarded the plaintiffs a total of $600,000 on count one of their complaint, based on express contract, to recover a real estate brokerage commission allegedly due for their services to the defendants. The jury found for the defendants on the second count, on which the plaintiffs had sought recovery in quantum meruit. The judge denied the defendants' motions for a directed verdict, made at the close of all the evidence, and for judgment notwithstanding the verdict on count one. Mass. R. Civ. P. 50 (b), 365 Mass. 814 (1974). The Appeals Court reversed, ordering judgment on count one to enter for the defendants. *Bonin* v. *Chestnut Hill Towers Realty Co.,* 14 Mass. App. Ct. 63 (1982). We granted the plaintiffs' application for further appellate review. We reach the same result.

In reviewing the denial of a motion for judgment notwithstanding the verdict, as well as for a directed verdict, the standard to be employed is whether "the evidence, construed against the moving party, justif[ies] a verdict against him." *D'Annolfo* v. *Stoneham Hous. Auth.,* 375 Mass. 650, 657 (1978). See *Alholm* v. *Wareham,* 371 Mass. 621, 627 (1976). Considering the evidence in the light most favorable to the plaintiffs, the jury could have found these facts: In 1976, Chestnut Hill Towers Realty Corp. (Chestnut Hill Towers), a limited partnership comprised of Joseph Carabetta and Carabetta Enterprises, Inc., owned land in Newton on which a multi-unit apartment complex (the property) was in the early stages of construction. Joseph Carabetta, an experienced developer and chief executive officer of Carabetta Enterprises,

Inc., was approached by Star through the efforts of Star's employee, Angela Bonin. At a meeting among Bonin, Carabetta, and Star's president, Leonard Abramson, held on January 18, 1977, Carabetta gave permission to Star, which specialized in investment property, to list the property for sale. Carabetta said that he required a net return of $3,000,000 over the existing mortgage of $18,881,000. Abramson requested a commission of $600,000 and Carabetta agreed.[3] As a result, Star listed the property for sale at a price of $22,500,000.

Abramson quickly talked to a client of his, Paul Slater, about possible purchase of the property. Slater owned several sizable properties. At a preliminary meeting on January 20, among Abramson, Bonin, and two associates of Slater, it was disclosed to Star that one George Katz would attend a planned meeting between the principals. Katz, an associate and friend of Slater, was also a syndicator and partner of the firm Private Investment Placements (PIP).[4] Abramson and Bonin responded that Star was "authorized to sell the property," and that Katz should be reminded of this "to make sure that we were all headed in the same direction."[5]

---

[3] Bonin testified that Carabetta said, "$600,000 is okay with me. You can get a million dollars as long as I get what I want. I don't care what you ask for as commission." She further testified that she and Star wanted their commission "immediately upon sale," and that Carabetta would accept $1,000,000 at the time of sale and the $2,000,000 balance in equal payments over a three-year period.

[4] In a syndication of real estate, investors are solicited to purchase shares and thus become limited partners in the partnership holding the property.

[5] At trial, Bonin testified as follows:

DEFENDANT'S COUNSEL: "As of the conclusion of that [January 18 meeting, it is true, is it not, that Mr. Carabetta had hired Star Realty only to sell his property, not to syndicate?"

THE WITNESS: "That's right."

". . . ."

DEFENDANT'S COUNSEL: "And you then said [to Slater's associates]: 'Make sure [Katz] knows that this is a sale. There's no syndication here.' That is what you told them, isn't it, back on January 20th?"

THE WITNESS: "Or words to that effect; yes."

DEFENDANT'S COUNSEL: "In your original discussions, Mrs. Bonin, you and Mr. Abramson and Mr. Carabetta were talking about a straight purchase. That's clear, is it not?"

On January 27, the meeting was held in Slater's office with Slater, Katz, and two other associates, and Abramson and Bonin in attendance. Michael Fiondella, Carabetta's accountant, represented Carabetta. According to Bonin, Katz opened the meeting by saying, "[W]e don't want to buy your property, we want to syndicate it." Fiondella immediately protested that he had been brought to the meeting under false pretenses by Bonin, and Bonin told Katz "that he had been told that he was there to discuss an acquisition or purchase of the property, not syndication." The meeting continued for a time, during which Fiondella allowed Katz to examine some financial data about the property. At the end of the meeting, the participants exchanged business cards, and Fiondella asked with whom he should get in touch if it became necessary. Slater and Katz told Fiondella he could "get in touch with any of us." Slater testified, in essence, that he had no further dealings involving the property after that date.

That evening Katz, who was to leave shortly for a month's trip, telephoned Bonin at the home of a mutual friend. She upbraided him for having raised the subject of syndication at the meeting "when he had been asked not to do that." According to Bonin, Katz was enthusiastic about the property and asked her to be in touch with him and with an associate to find other projects for him to syndicate. Subsequently she showed other property to that associate, and she estimated that she spoke with Katz by telephone about eight or ten times over the next four months. In these conversations they spoke of the Chestnut Hill Towers property and several other properties. Katz never asked her to "supply any more information" with respect to Chestnut Hill Towers, after the initial meeting. On May 23, she telephoned to tell Katz of Abramson's death, and Katz

THE WITNESS: "Originally."
DEFENDANT'S COUNSEL: "Originally. By 'originally' you mean back [in] January of 1977?"
THE WITNESS: "Yes."
Carabetta testified that he was accustomed to syndicating real estate projects, that he had used syndicators in New York, Connecticut, and Massachusetts, and that by January, 1977, his firm had contacted several syndicators in connection with this property.

told her that "they weren't going to do the Chestnut Hill Towers project." Bonin did not talk to Katz again for many months.

Bonin testified to the attempts of other brokers at Star as well as to her own attempts to interest prospective buyers in the property. On behalf of one such prospect, Bonin received tax projections from Fiondella on March 9, 1977, together with a transmittal letter which stated, "It is our understanding that any sale by CEI [Carabetta Enterprises, Inc.] will be a 100% sale with no guarantees by CEI." On April 16, 1977, Fiondella wrote to Bonin asking for the return of the tax projections and notifying her that the property was no longer for sale "unless otherwise authorized in writing" by Carabetta. Bonin immediately talked with Carabetta, who told her that Fiondella was probably prompted to write because he was close to effecting a syndication of the property. Bonin testified that she persuaded Carabetta to allow Star to continue working as long as he did not have another deal. She then wrote Fiondella, promising to "comply with [Carabetta's] guidelines." On April 29, she wrote to Carabetta stating that Star believed "we have what we've been seeking . . . a cash buyer who will meet your terms; who is *not* interested in any kind of syndication; who is *not* a builder; who needs great tax shelter" (emphasis in original). Star's efforts continued through October; proposals by two of Star's clients were described by the plaintiffs as offers to syndicate and by the defendants as offers to purchase and then to syndicate the property. None of these negotiations bore fruit.

On November 16, 1977, Katz's Firm, PIP, was given an exclusive agency to "use [its] best efforts to sell limited partnership interests" in the partnership. By the terms of the agreement, Carabetta and Carabetta Enterprises, Inc., would remain as general partners jointly holding a 1% interest in the partnership. The net proceeds of the offering were to be not less than $2,950,012. PIP received a gross fee of $299,988. Katz and his partner in PIP became special limited partners. Katz testified that several persons had spoken to him during the summer of

1977 with respect to syndication of the property.[6] Among them was an accountant for one Robert Tracy, who at that time was Carabetta's exclusive agent to syndicate the project. Tracy's accountant mailed Katz information about the project on July 19. On August 16, Katz sent Carabetta a mailgram stating, "I believe we can give you three million dollars as investment in Chestnut Hill Towers, contingent upon mutually-agreeable conditions." There was evidence from Carabetta's pretrial deposition, repudiated by him at trial, from which the jury could have found that Katz and Fiondella began dealing with each other in April. Upon learning, at the end of November or first of December, that Katz was syndicating the property, Bonin wrote to him claiming to have brought the property to his attention. Both Katz and Carabetta rebuffed her attempts to press her claim with them.

The defendants argue that the plaintiffs' evidence is insufficient as a matter of law to show that Carabetta authorized Star, either by their original agreement or by a waiver of its terms, to effect a syndication of the property, or to show that Star and Bonin were the predominating, efficient cause of the syndication which ultimately took place. They further contend that, as there was never any agreement with the plaintiffs with respect to syndication, there could be no agreement to pay them $600,000 in the event that a syndication occurred. The defendants urge that, because of the fundamental difference between a syndication (sale of shares or securities in a limited partnership) and a sale of real property (conveyance of property by deed), it was error to submit to the jury the question whether the plaintiffs had earned a commission in this case. The plaintiffs counter that the evidence warranted findings that Carabetta listed the property with Star for an agreed commission of $600,000, that the agreement to pay a commission was not conditioned on Star's producing a buyer who would take title to the property,[7] that the plaintiffs were the efficient, predomi-

---

[6] One of the persons who contacted Katz was an attorney for a client of Star. Katz declined the offer to join this client's team as a syndicator of the property.

[7] In their argument to this court, the plaintiffs further contend that if any restriction on Star's authority to produce a syndicator rather than a buyer in

nating cause of the syndication, and that Carabetta and Katz dealt secretly with one another in order to avoid paying the agreed commission to the plaintiffs. We consider those conten-tions in turn.

1. *The original agreement.* The parties do not dispute that after a meeting held on January 18, 1977, among Abramson, Bonin, and Carabetta, the property was listed by Star at an asking price of $22,500,000. Despite some disparity in the testimony of the parties, there was ample evidence from which the jury could conclude that Carabetta authorized Star to list the property. There was also sufficient evidence that Star's potential commission was fixed by the parties at $600,000. This included Carabetta's own testimony that he told Abramson and Bonin that he required a net profit of $3,000,000. On conflicting evidence, it was open to the jury to find both the existence of the oral agreement and the agreed upon commis-sion. See *McEvoy* v. *Ginsberg,* 345 Mass. 733, 736 (1963). With respect to the nature and extent of the plaintiffs' authority under the agreement, however, we do not reach the same conclusion. The testimony of all the parties was in accord that, at the time of the January 27 meeting at which Star brought the property to the attention of Katz, the plaintiffs were limited

---

the conventional sense ever existed, the jury could have concluded that the agreement was amended by Carabetta's subsequent conduct. The plaintiffs cite evidence of offers by one Kosow and one Simon, clients of Star, involving possible syndication of the property. In their brief to the Appeals Court, the plaintiffs made reference to "their efforts . . . through September of 1977 including the production of two syndicators, Simon and Kosow." The defendants, and not the plaintiffs, briefed to the Appeals Court the question whether these offers to syndicate showed a waiver of any restriction in the original brokerage agreement. As this evidence could have been considered by the jury on this basis, the Appeals Court properly considered it on the question of the sufficiency of the plaintiffs' evidence. See *Raunela* v. *Hertz Corp.,* 361 Mass. 341, 343 (1972), quoting *Kelly* v. *Railway Exp. Agency, Inc.,* 315 Mass. 301, 302 (1943) (test to determine whether a verdict should be directed is whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff"). We have reviewed evidence pertinent to yet another client of Star, one Roger Stern, which is raised by the plaintiffs for the first time on this appeal, on the same principle.

to producing a buyer who would take a conveyance of the property, and not a prospect whose objective was a syndication for the defendants. The plaintiffs themselves assert that Katz attended the meeting as "part of a team of prospective purchasers produced by Star." We are not persuaded by the plaintiffs' argument that the terms of the agreement were intended, not to limit the plaintiffs' ability to earn a commission, but only to convey to them that Carabetta was already working with syndicators he had obtained through his own efforts. The fact that the defendants were amenable to syndication through other avenues is irrelevant to the terms of the express agreement they reached with Star. It is well settled that an owner may condition his liability to pay a broker's commission on his producing a purchaser who meets the terms he has specified. See *Gaynor* v. *Laverdure,* 362 Mass. 828, 835 (1973). Here, the evidence requires a finding that the original agreement specified that Star should confine itself to seeking a straight purchaser for the property. In view of this specification, and of Bonin's testimony that she sought before and during the January 27 meeting to avoid any mention of syndication, the jury would not have been warranted, as plaintiffs suggest, in finding that Carabetta's "initial statements to Star concerning syndicators [were] merely advisory." Thus, it was not open to the jury to conclude that the plaintiffs had fulfilled their obligation under their express contract to produce a buyer by introducing Katz, ultimately the syndicator, to the property on January 27. See *Tristram's Landing, Inc.* v. *Wait,* 367 Mass. 622, 629 (1975) (hereafter a real estate broker will be entitled, under his agreement, to a commission from the seller when, inter alia, "he produces a purchaser ready, willing and able to buy *on the terms fixed by the owner")* (emphasis added); *Id.* at 629. *Holton* v. *Shepard,* 291 Mass. 513, 516 (1935) ("There must be evidence in the record to support a finding that the plaintiff performed [the] agreement in order to entitle him to go to the jury").

Nor do we view the distinction between a sale by conveyance of the property and a sale of limited partnership interests in the partnership as formal or artificial in this case. The jury could

have found, as the plaintiffs argue, that Carabetta was indifferent whether he received the $3,000,000 profit from a sale or a syndication of the project. But it does not follow that such indifference existed with respect to the limitation against syndication by the plaintiffs, nor is a finding of indifference toward that limitation warranted by the evidence. This is not a situation in which the seller's version of a critical term of the brokerage agreement was contradicted by the broker's testimony. Contrast *Johnstone* v. *Cochrane,* 231 Mass. 472, 476 (1919) (where the sale of corporate property to purchaser who was produced by the plaintiff was for $250,000, of which $160,000 was paid in cash and $90,000 in preferred stock of a new corporation, and the defendant seller contended that the plaintiff broker was authorized to produce a buyer for $250,000 cash, broker's testimony did not show his authority was so limited, and part of his testimony negatived that contention). Nor is the case before us one in which the prospective customer was produced by the broker in conformity with the brokerage agreement, and ultimately the transaction, while different in form, conformed in substance to the terms of the agreement. Contrast *Morad* v. *Haddad,* 329 Mass. 730, 735 (1953) ("transfer of stock by [the seller] effected the sale of the corporate property for which [the broker] had been employed to find a customer. . . . The sale of all the stock of the corporation was in legal effect a sale of all of its assets, and the mere fact that the parties found it more convenient to transfer all of the stock rather than to make a conveyance of its assets does not change the substance of the transaction"). In the case before us the right to pursue a syndication was reserved at the outset by the owner to himself, and was withheld from the plaintiffs. The syndication which eventuated was not contemplated by the original brokerage agreement. Hence, in considering the plaintiffs' express contract claim, the jury could not properly have found otherwise. *Holton* v. *Shepard, supra.* See also *Creed* v. *Apog,* 6 Mass. App. Ct. 365, 374 (1978), modified on other grounds, 377 Mass. 522 (1979).

2. *Waiver.* In the absence of evidence that Carabetta waived the original contract limitation, the plaintiffs could not have

been found to be the efficient cause of the ultimate transaction,[8] and could not have been found to have earned a commission unless the jury could find that the defendants dealt in bad faith. See *Kacavas* v. *Diamond,* 303 Mass. 88, 92-93 (1939); *Creed* v. *Apog, supra* 371-374; Restatement (Second) of Agency §§ 448, 454 (1958).

On the evidence most favorable to the plaintiffs, the jury could have found that as early as the evening of January 27, in the same conversation in which she rebuked Katz for having mentioned syndication to Fiondella earlier in the day, Bonin did not discourage him from considering the property in terms of syndication.[9] This conversation was followed by eight or ten more conversations, the last one taking place on May 23. Even if the jury were to infer that the substance of the discussions was the prospect of Katz syndicating the property, the conduct of Bonin and Katz was not evidence that the restriction on Star's authority had been relaxed by the defendants. Such evidence could have come, in this case, either by Carabetta's express directions to Bonin at their meeting on April 16 at the construction site, or by the conduct of the defendants in entertaining nonbuyer prospects produced by Star.

Bonin's testimony of the April 16 meeting does not make out a waiver. She knew during that month that other syndicators were on the construction site,[10] and when Carabetta told her the project might be close to a syndication, she assumed, and Carabetta agreed, that Star could "still work on it" as long as Carabetta did not have a final deal. She testified that at that meeting she was authorized to continue working on the project

---

[8] We make no intimation of what would constitute the "efficient cause" entitling the broker to his commission in the case of an agreement between the owner and the broker that syndication of the property is the object.

[9] Bonin's sole testimony which could be given this effect was: "I think I said something like: 'You don't need any other project. This is the best thing you are going to find.' or 'You ought to put all your eggs in this basket because this is the best project you are going to get,' or something like that."

[10] Bonin testified that she knew that Tracy, among others, was working on syndication at that time, and that she met with him in October to commiserate about their respective failures to close a deal on the property.

for someone that seemed to be a possible buyer. Bonin's letters to Fiondella and to Carabetta, promising to comply with Carabetta's "guidelines" and referring to a prospect for a cash sale who was not interested in syndication, as "what we've been seeking," were within two weeks of the April 16 meeting. This evidence did not show that any modification of the original listing agreement was either sought or granted at the April meeting.

The dissent relies upon testimony of one Allen, another of Star's brokers, as providing evidence of a waiver in April, 1977. Allen testified that Stern was interested in doing a syndication and having Carabetta remain as a general partner. There was no evidence that this interest of Stern's was ever communicated to the defendants. Clearly, an "interest" of a possible purchaser expressed only to the plaintiff is not evidence that the defendants waived an express provision of the contract between the plaintiffs and the defendants. From Allen's testimony, the jury could have found that Stern told Carabetta that he was willing to set aside $800,000 that would be Carabetta's if the costs of completing the project did not exceed a stated amount and that Carabetta said he would think about it. This offer was not an offer to syndicate,[11] but a device to keep Carabetta involved in the project until construction was completed in order to achieve a desired final cost. Even if the offer had been an offer to syndicate in the commonly understood sense, it is doubtful if a finding of waiver could be based upon Carabetta's statement that he would think about it, followed by his rejection of the offer. It should also be pointed out that the interpretation placed upon this testimony by the dissent is at odds with Bonin's own letter to Carabetta written at the end of April wherein she acknowledges that the restriction on syndication was still in effect.

In July, Star produced the first of a series of proposals from two customers, Kosow and Simon, who it contends were prospective syndicators. These proposals were the subject of eight exhibits at trial. There was some evidence that the defendants

---

[11] See *ante* at note 4.

negotiated with both prospects. The Appeals Court determined that "[n]either Kosow nor Simon . . . proposed to sell limited partnership interests for Carabetta or the [p]artnership; rather each proposed to buy the property conditioned on his ability thereafter to syndicate the property for his own account." *S.C.*, 14 Mass. App. Ct., *supra* at 70. Even if the jury could conclude, on conflicting evidence, that these negotiations were evidence that the defendants broadened Star's authority under their agreement, the plaintiffs would have to show that Katz was procured through their efforts. Assuming that the jury could have found that the plaintiffs' authority was expanded as a result of these negotiations, the plaintiffs produced no evidence of further attempts to interest Katz in the property through the time of actual syndication in December. Instead they rely on their introduction of Katz in January as a potential buyer, and on the telephone conversations between Bonin and Katz which ceased in May when Katz communicated his lack of interest in the project. At the conclusion of the January meeting, the defendants could have accepted Katz as a syndicator and would have owed the plaintiffs nothing on the contract. The events of July, occurring after all Bonin's contact with Katz had ceased could, therefore, have no effect on the plaintiffs' right to a commission arising out of a syndication by Katz. If the contract was changed in July to permit the plaintiffs to seek syndicators and they made no further efforts to interest Katz in the transaction, the plaintiffs could not be the efficient or effective means of bringing about a syndication. *Kacavas* v. *Diamond,* 303 Mass. 88, 92 (1939).[12]

---

[12] The plaintiffs' contention, that the Kosow and Simon proposals demonstrate that they were not barred from procuring syndicators under the original agreement, fails by virtue of our conclusion in part 1 of this opinion. *Supra* at 64-66. Since the terms of the original contract were clear the July events might demonstrate that the restriction against syndicators had been waived for the future but could not be understood as varying the terms that existed in January. The further contention that Fiondella's conduct at the end of the January 27 meeting was a "personal" acceptance of Katz as Star's customer for syndication purposes, and signified that the defendants and Slater's team would now deal directly with no further negotiations required by Star, must fail for the same reason.

3. *Bad faith*. Employing the same reasoning, we think that the jury would not have been warranted in finding that the defendants dealt secretly with Katz in order to avoid paying a commission to the plaintiffs. In *Kacavas* v. *Diamond, supra,* we said that liability to pay a commission may exist where "'unethical conduct of the employer . . . results in preventing full performance by the broker although the benefit which the employer sought from the broker's exertion is obtained by him.' . . . Unethical conduct or bad faith . . . 'means a purpose on the part of the defendant[s] to obtain without payment a profit from the plaintiff's exertions.' . . . Bad faith exists where the employer revokes the broker's authority or makes the sale through other means when the broker has performed all he has undertaken, or is plainly or evidently approaching success in his undertaking" (citations omitted) *Id.* at 92-93. Here, the jury could have found that Carabetta knew in January, 1977, that his own syndicators were not having success in moving the project, and they could have found that the first contact between Katz and the defendants did not occur in August, but as early as April, 1977. Even assuming that Bonin was also attempting to recruit Katz as a syndicator during this period, her authorization at that time was limited to finding a purchaser, while Carabetta was free under the agreement with Star to pursue a syndicator. Thus it cannot be said that the defendants' actions prevented full performance by the plaintiffs, or sought to obtain, without payment, the benefit of the efforts for which they were employed. Even if the jury believed that Fiondella's April memo withdrawing the property from the market, and Katz's purported indemnification agreement with Carabetta, executed after Bonin claimed a commission, showed that the defendants believed they were liable to the plaintiffs, a finding of bad faith was not warranted. Here, the contract was not revoked, and the plaintiffs continued to bring prospects to the defendants. There was no showing that the defendants prevented the plaintiffs from performing under their contract to produce a buyer for the property. In the absence of any liability arising under the contract, the question of bad faith in connection with an express contract claim could not succeed. Cf. *Siegel* v. *Lowe*,

327 Mass. 154, 155 (1951) (Evidence that owner withdrew property from the market could have been found to be designed "to avail himself of the services [of the broker who introduced the buyer] without paying him"); *Kinchla* v. *Welsh,* 8 Mass. App. Ct. 367, 371 (1979); *Creed* v. *Apog,* 6 Mass. App. Ct. 365, 375 (1978). See *Palmer* v. *Cherney,* 270 Mass. 551, 556-557 (1930) (In circumstances showing that broker never produced a customer ready, willing, and able to purchase on terms authorized by the owners, statements of the owners that they would have been willing to pay commission if brokers had treated them properly "would not make them chargeable therefor in the absence of any evidence showing a legal liability").

The dissent's incantation of the virtues of having questions of fact decided by juries is quite wide of the mark. Rather than trenching upon any long established line of demarcation between the role of judge and jury, we have simply applied the time tested and universally approved formula for discerning when a party with the burden of proof has failed in his obligation to introduce enough evidence to permit a jury to find in his favor. "In a civil case, as to motions for a directed verdict or for judgment notwithstanding the verdict, if the judge, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, considers the evidence in the light most favorable to the party against whom the motion is directed and determines that the jury could reasonably find just *one* way, the judge should allow the motion . . . . *O' Shaughnessy* v. *Besse,* 7 Mass. App. [Ct.] 727 (1979). *Adams* v. *Herbert,* 345 Mass. 588 (1963). Cf. *Abraham* v. *Woburn,* [10 Mass. App. Ct. 416 (1980)]." P.J. Liacos, Massachusetts Evidence 46 (5th Ed. 1981). We have demonstrated above that a reasonable jury would have no option but to conclude that the plaintiffs' contract was limited to producing buyers for the property and that this limitation was never waived at any time material to the events in question.

Because we conclude that a verdict should have been directed for the defendants on the plaintiffs' claims in express contract, it is unnecessary to reach the other arguments made by the parties. The judgment on count one is reversed, and a judgment is to be entered thereon for the defendants.

*So ordered.*

ABRAMS, J. (dissenting, with whom Liacos, J., and Nolan, J., join). This court has long adhered to the rule that, in suits by real estate brokers against property owners to recover commissions due for services performed, it is "for the jury to determine what the agreement of the parties was and whether the plaintiff complied with it." *McEvoy* v. *Ginsberg,* 345 Mass. 733, 736 (1963). *Boyle* v. *Goldenberg,* 267 Mass. 24, 27 (1929). I perceive no reason why this rule should be inapplicable where the broker's services are rendered in connection with a syndication of property.[1] The jury's verdict for the plaintiffs in the instant case must be assumed to incorporate a factual determination that the plaintiffs' efforts constituted the efficient cause of Katz's syndication of the Chestnut Hill Towers

[1] The court correctly refuses to adopt the Appeals Court's conclusion that a real estate broker is, as a matter of law, precluded from earning a commission in a syndication transaction. Because the court concludes that there was no evidence indicating that the defendants authorized the plaintiffs to seek out syndicators, it does not decide "what would constitute the 'efficient cause' entitling the broker to his commission in the case of an agreement between the owner and the broker that syndication of the property is the object." *Ante* at note 8. Because, on my view of the evidence, the jury could have found that the plaintiffs produced Katz as a syndicator at a time when they were authorized to do so, I discuss the question whether a broker may be the efficient cause of a syndication. In my opinion, a broker who brings together an owner and a syndicator capable of producing $3,000,000 profit for the owner performs a service indistinguishable in practical effect from the service provided by a broker who matches the owner with a buyer willing to purchase the property at a price that will net the owner a $3,000,000 profit. An owner may, without legal or logical impediment, contract to pay a commission to a broker whose efforts produce a syndicator capable of effectuating a syndication on the owner's terms; a broker who fulfils such a contract may be deemed the efficient cause of the syndication.

Because a broker's services leading to a syndication of property resemble those performed by a broker hired to effectuate a sale or a lease, I see no reason to vary the standard of efficient causation applied in precedents involving sales and leases. See *Holton* v. *Shepard,* 291 Mass. 513, 516 (1935) (broker may be found to be efficient cause of transaction, provided broker produces customer prior to termination of broker's employment, and that connection between broker's efforts and transaction is causally unbroken); *Stuart* v. *Valsom,* 249 Mass. 149, 151 (1924). Cf. *Siegel* v. *Lowe,* 327 Mass. 154, 155 (1951) (to be efficient cause of transaction, broker "did not have to be present [when transaction consummated], or cognizant of it at the time, and its terms need not be the same as those given to the broker").

project, as well as a finding that the plaintiffs' agreement with the defendants entitled the plaintiffs to a commission for the services performed. Thus, the verdict must be upheld if "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff[s]." *Boyle* v. *Wenk,* 378 Mass. 592, 593 (1979), quoting *Raunela* v. *Hertz Corp.,* 361 Mass. 341, 343 (1972). Accord *Chase* v. *Roy,* 363 Mass. 402, 404 (1973). The jurors, conscientiously exercising their responsibilities as fact finders, could reasonably conclude on the basis of record evidence that the plaintiffs earned a commission through efforts culminating in a syndication yielding the $3,000,000 profit desired by the defendants.

The court concedes that "[t]he jury could have found . . . that Carabetta was indifferent whether he received the $3,000,000 profit from a sale or a syndication of the project." *Ante* at 65-66. Carabetta summed up his outlook on the transaction when he stated at trial that "[t]he American dollar is all [the defendants were] interested in." The court asserts that "it does not follow" from Carabetta's disinterest in the form of the transaction that he authorized the plaintiffs to seek out syndicators. *Ante* at 66. the question whether it "followed" from this evidence that Carabetta agreed to pay a commission to the plaintiffs if they procured a syndicator is within the realm of reasonable inferences a jury should be permitted to make. I am unable to discern why the jury should be precluded from considering Carabetta's indifference to the form of the transaction as persuasive evidence in support of the plaintiffs' claim that, though Carabetta originally hired them to find a buyer (as opposed to a syndicator), he subsequently waived the syndicator restriction.

It is undisputed that, at a January 27, 1977, meeting arranged by the plaintiffs, Fiondella, Carabetta's agent, was introduced to Katz, the eventual syndicator of the defendants' property. According to Bonin, when Katz, in the course of the meeting, proposed a syndication, Fiondella protested that he (Fiondella) was not there to discuss a syndication. Bonin stated that Fiondella nonetheless remained at the meeting, provided Katz with

financial information, exchanged business cards, and left open the possibility of a deal. Carabetta acknowledged that a broker who put him in contact with a syndicator capable of producing the target profit after it became apparent that Carabetta's regular syndicators were not succeeding in putting together a syndication deal would be performing "a valuable service." The court offers no explanation why the jury could not rationally infer that, when it became evident that the plaintiffs' clients included a syndicator interested in consummating a transaction on Carabetta's terms, the defendants elected to deal with the plaintiffs as a source of syndicators as well as prospective purchasers.

Bonin stated that Katz called her on the evening of January 27 to express his enthusiasm for the Chestnut Hill Towers project. Bonin encouraged Katz to pursue a deal with Carabetta, telling Katz that "[y]ou ought to put all your eggs in this basket because this is the best project you are going to get." The court admits that "the jury could have found that as early as the evening of January 27 . . . Bonin did not discourage [Katz] from considering the property in terms of syndication." *Ante* at 67. According to Bonin, she discussed the Chestnut Hill Towers project with Katz in the course of eight to ten subsequent conversations that took place through May 23, 1977. The jury could infer that Bonin not only alerted Katz to the existence of the Chestnut Hill property, "but that she furnished him with information about the project and attempted to keep him interested in it." *Bonin* v. *Chestnut Hill Towers Realty Co.*, 14 Mass. App. Ct. 63, 71 (1982). Further, as the court observes, "the jury could have found that Carabetta knew in January, 1977, that his own syndicators were not having success in moving the project, and . . . that the first contact between Katz and the defendants . . . occur[red] . . . as early as April 1977." *Ante* at 70.

On this evidence, it was permissible for the jury to conclude that the plaintiffs nourished Katz's interest in the syndication, and that, as a direct result, Katz and the defendants began negotiations that culminated in a successful syndication. The court nonetheless nullifies the jury verdict for the plaintiffs,

asserting that, on the evidence, the jury was precluded from finding that the plaintiffs' recruitment of Katz as a syndicator was authorized by the defendants. The court agrees that evidence of such authorization "could have come, in this case, either by Carabetta's express directions to Bonin at their meeting on April 16 at the construction site, or by the conduct of the defendants in entertaining nonbuyer prospects produced by Star," *ante* at 67, but it minimizes or ignores all such evidence.

Bonin stated that, after receiving a letter from Fiondella in April, 1977, stating that the Chestnut Hill property was being taken off the market, she went to see Carabetta. According to Bonin, Carabetta told her that Fiondella was negotiating a syndication but authorized Bonin to continue seeking out prospects interested in the property.[2] Explaining her understanding of the agreement reached in April, Bonin stated, "I was authorized to sell [the property], and that is what I was looking to do, even to sell it to people who would syndicate it." Carabetta denied authorizing Bonin to seek out syndicators. The jury was under no obligation to believe Carabetta. Carabetta's lawyer, who at one point was forced to point out to the judge that his client was testifying falsely under oath, described Carabetta to the jury as being "no prize" as a witness. In light of Bonin's account of the extent of her authority in April, there was a factual issue for the jury.

Further evidence of a waiver of the syndication restriction was provided by Susan Allen, one of several Star brokers, who introduced Star clients to Carabetta. Allen testified that

---

[2] The following statements were elicited from Carabetta with respect to the plaintiffs' continued authority to seek out clients interested in a transaction involving the Chestnut Hill property:

PLAINTIFFS' COUNSEL: "You continued [in April, 1977] to have Mr. Fiondella see people that were brought by Star Realty brokers to the job; correct?"

THE WITNESS: "Yes, sir."

PLAINTIFFS' COUNSEL: "Because you realized that they were still working for you, didn't you?"

THE WITNESS: "Yes."

PLAINTIFFS' COUNSEL: "And you wanted to pay them their fee earned — that brokerage fee; didn't you?"

THE WITNESS: "Absolutely."

one such client, Roger Stern, "was interested in doing a syndication and having Mr. Carabetta remain as a general partner with Mr. Stern"; that in early April, 1977, Stern and Carabetta discussed Stern's syndication proposal; and that Carabetta said that "he had to think about it." The record thus clearly supports a finding that in April, 1977, Carabetta was prepared to consider syndication offers from Star clients. The court asserts that "[e]ven if the [Stern] offer had been an offer to syndicate in the commonly understood sense, it is doubtful if a finding of waiver could be based upon Carabetta's statement that he would think about it, followed by his rejection of the offer." *Ante* at 68. The court apparently concedes, however, that evidence of the defendants' unconsummated negotiations in July, 1977, with Kosow and Simon, two prospective syndicators produced by Star, was sufficient to permit the jury to conclude that in that month the defendants broadened Star's authority to include syndicators.[3] Given Bonin's statement about her authority in April, as well as the defendants' April negotiations with Stern, I find perplexing the court's conclusion that the jury was not free to draw a similar inference as to the extent of the plaintiffs' authority in April.[4]

[3] The Appeals Court's determination that Kosow's and Simon's proposals were limited to syndication on their own accounts, rather than on Carabetta's account, 14 Mass. App. Ct. 63, 70 (1982), is erroneous. Paragraph 9 of the plaintiffs' exhibit 13, a proposal which, according to Bonin's testimony, was dictated to her over the telephone by Kosow and subsequently transmitted to Carabetta, reads as follows: "Buyer will give investors of syndication approximately 50% of the equity. The remaining approximately 50% equity will be split 50/50 between the seller and the buyer." The Kosow proposal thus indicates that Carabetta would remain a partner in the syndicated property, retaining a 25% interest in the equity.

[4] In dismissing evidence from which the jury could infer a waiver in April of the original restriction on Star's procurement of syndicators, the court places great emphasis on Bonin's April 29 letter to Carabetta characterizing a cash buyer as "what we've been seeking." *Ante* at 62. The court reads that letter as an acknowledgment by Bonin "that the restriction on syndication was still in effect." *Ante* at 68. Although the jury could have adopted the gloss placed on the April 29 letter by the court, it was not required to do so; there is no inconsistency between Bonin's statement that she had been seeking a cash buyer and her claim that, in April, she was also authorized to seek syndicators. Interpretation of the April 29 letter was a matter for the jury's consideration in light of the other evidence presented.

On May 23, 1977, at a time when the jury could have found that Katz was negotiating a syndication with the defendants, Katz gave Bonin the "bad news" that he had decided not to participate in any transaction involving the Chestnut Hill property. The jury should have been permitted to draw its own conclusions as to whether Katz and the defendants dealt secretly in order "to obtain, without payment, the benefit of the efforts for which [the plaintiffs] were employed."[5] *Ante* at 70.

The record indicates that the defendants hired the plaintiffs, that the defendants were indifferent to the means by which they obtained a $3,000,000 profit, that the plaintiffs expended considerable time and effort on the defendants' behalf, that the plaintiffs brought Katz and the defendants together, that the defendants negotiated with other syndicators produced by the plaintiffs, and that the defendants obtained everything they wanted from a syndication reasonably attributable to the plaintiffs' efforts.[6] In taking the jury verdict away from the plaintiffs, the court departs from the axiom that "[t]he law will not allow the owner of property . . . to reap the fruits of [the] broker's labor and then deny him his just reward." *O'Glee* v. *Trigg,* 271 F. Supp. 121, 122 (E.D. Ark. 1967).

The evidence presented a question of fact as to whether the plaintiffs were authorized to seek out syndicators. Jurors saw the witnesses, and their judgment of the credibility of the witnesses, of the comparable strength of the conflicting evi-

---

[5] As the Appeals Court noted, "Katz and Carabetta's dealings with [Bonin] do not stand as a model of decency, wisdom and candor." 14 Mass. App. Ct., *supra* at 75.

[6] In fact, Carabetta may receive more from the syndication than he would from a straight sale. Carabetta testified as follows:

PLAINTIFFS' COUNSEL: "Now, Mr. Carabetta, is it fair to say that you will receive — by you I mean the owners of the equity — what's transferred; you will receive at least three million dollars from this transaction?"

THE WITNESS: "Yes, sir."

PLAINTIFFS' COUNSEL: "Can you tell us how much more than three million dollars would be a fair portion?"

THE WITNESS: "I think that's three million, two hundred and fifty [thousand]."

Under the syndication agreement, Carabetta also retained a fifty per cent residual interest in the property.

dence, and of the factual validity of the contentions put forth by each side should be immune from attack.[7] It is the jurors who decide questions of fact, and who apply the law to the facts, not judges. "[W]e have no authority to take upon ourselves the duties of a tribunal of fact, and to determine what verdicts should have been rendered by the jury." *Electric Welding Co.* v. *Prince,* 200 Mass. 386, 392 (1909).

In discounting evidence on the basis of which the jury could properly have found facts supportive of the plaintiffs' claim, the court negates the traditional division of functions between judge and jury. This "separation of the functions of court and jury . . . cannot be confounded or disregarded without endangering the stability of public justice, as well as the security of private and personal rights." *Commonwealth* v. *Canon,* 373 Mass. 494, 515-516 (1977), quoting *Sparf & Hansen* v. *United States,* 156 U.S. 51, 106 (1895). The court is the ultimate guardian of the proper allocation of these duties; if the court does not act with restraint in reviewing the sufficiency of the evidence, it abuses its trust, with harmful consequences to the administration of justice and to community acceptance of the rule of law. That acceptance is rooted in the central role of the jury in our legal system. The court's decision "trenches on our long-established, consistently applied, and zealously guarded line of demarcation between the respective roles, functions, and responsibilities of the judge and of the jury." *Commonwealth* v. *Dickerson,* 372 Mass. 783, 802 (1977) (Quirico, J., concurring). The court's decision deprives these plaintiffs of their right to have the facts decided by the jury and usurps the jury's rightful role, thereby "diminishing the extent of citizen participation in the administration of justice and the many benefits which flow from such participation." *Commonwealth* v. *Canon, supra* at 516 (Abrams, J., dissenting).

Because the facts support a conclusion that "[m]ore than one decision was possible to honest and reasonable [persons], and, therefore, the jury was the tribunal to determine which one," *Hicks* v. *H.B. Church Truck Serv. Co.,* 259 Mass. 272, 277 (1927), I respectfully dissent.

---

[7] I note that an experienced and able trial judge denied the defendant's motion for judgment notwithstanding the verdict.