MARGARET R. JENKINS vs. RICHARD DeTUCCI & another.[1]

No. 95-P-1541.

Barnstable. May 10, 1996. - August 21, 1996.

Present: SMITH, PORADA, & IRELAND, JJ.

*Practice, Civil,* Judgment notwithstanding verdict. *Contract,* Interference with contractual relations.

In an action seeking damages for the defendants' intentional interference with the plaintiff's contractual relations with her employer, the judge should have allowed the defendants' motion for judgment notwithstanding the verdict where, in the circumstances, there was no evidence that the defendants' motive for interfering with the plaintiff's employment contract was improper [182-183] or that they used any improper means [183-184].

CIVIL ACTION commenced in the Superior Court Department on January 6, 1992.

The case was tried before *Elizabeth B. Donovan,* J.

*Michelle A. Kaczynski,* Assistant Attorney General, for the defendants.

*Michael P. Mason* for the plaintiff.

SMITH, J. The plaintiff, Margaret Jenkins, brought an action in the Superior Court against Richard DeTucci and Richard O'Meara claiming interference with her contractual relations with her employer, Nauset Workshop, Inc. (Nauset).[2]

The matter was tried before a Superior Court jury. In

---

[1]Richard O'Meara.

[2]The action was also brought against the Department of Mental Retardation; Nauset Workshop, Inc.; David P. Forsberg, then secretary of the Executive Office of Human Services; and Mary McCarthy, then Commissioner of the Department of Mental Retardation. Stipulations of dismissal were entered early in the litigation for the Department of Mental Retardation, Forsberg, and Nauset Workshop, Inc. Summary judgment was granted in favor of McCarthy. The plaintiff did not file a cross appeal.

answer to special questions, the jury found that the plaintiff had a contract with her employer; that the contract of employment was permanent; and that both defendants had intentionally and improperly interfered with the plaintiff's contract, causing her termination by Nauset. The jury awarded the plaintiff $300,000 for economic damages and $200,000 for emotional distress.

At the close of the plaintiff's case, the defendants filed a motion for a directed verdict, which was denied. The motion was renewed at the close of all the evidence and again was denied. After the verdicts, the defendants filed a motion for a judgment notwithstanding the verdict or, in the alternative, a motion for a new trial. The motion was denied, and the defendants claim error. The defendants also contend that the evidence was insufficient to defeat their common law immunity.

The standard for reviewing a motion for judgment notwithstanding the verdict which challenges the sufficiency of the plaintiff's evidence "is whether 'the evidence, construed against the moving party, justif[ies] a verdict against him.' " *Bonin* v. *Chestnut Hill Towers Realty Corp.*, 392 Mass. 58, 59 (1984), quoting from *D'Annolfo* v. *Stoneham Hous. Auth.*, 375 Mass. 650, 657 (1978). In reviewing the sufficiency of the evidence, we look to see "whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.' " *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978), quoting from *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972). Using the above standard, we summarize the facts and draw reasonable inferences therefrom.

On August 15, 1982, Jenkins was hired by Nauset to be its executive director. Nauset is an independent, nonprofit corporation that provides services to individuals with disabilities and mentally retarded individuals in the Cape Cod and Islands (Cape) region. Nauset had the only sheltered employment program on the Cape. In such a program, clients perform various tasks in a workshop setting. Nauset had a workshop located in Eastham and, in the mid-1980's, had built another facility in Hyannis.

Nauset received its funding from several sources, including the Department of Mental Retardation (DMR) and the

Department of Mental Health. The largest source of its funding was through its contract with DMR. When Jenkins left Nauset in 1989, DMR was providing Nauset with $750,000 to $800,000 of Nauset's total funding of $1,400,000.

In November, 1987, the defendant Richard O'Meara was appointed by DMR to be its Southeastern Regional Director. In that position, O'Meara became the awarding authority for all contracts and services in the Cape region. In 1988, the defendant Richard DeTucci became the director of the Cape region for DMR. DeTucci was responsible for negotiating contracts with providers, planning and redirecting the programs benefiting the mentally retarded in the Cape region, and overseeing their implementation. O'Meara was DeTucci's supervisor.

The area directors of DMR were responsible for overseeing contracts under the supervision of the regional offices. If a contractor, such as Nauset, was not performing adequately, the area director was expected to take affirmative action to make sure that the clients' health and well-being were protected. If a director decided that, in order to accomplish that end, a contract should not be renewed, it was within his authority to deny renewal. It also was within the authority and discretion of the area director to try to work out problems with providers.

In 1988, the trend in regard to programs for clients was turning from sheltered workshop programs, which Nauset provided, to supported employment programs. Those programs involved clients entering the community with a job coach or crew coach and being trained to perform a job. The supported employment program was more expensive because it required more staff. DeTucci was an advocate of the supported employment program.

Nauset decided that it needed to respond to the trend from sheltered employment programs to supported employment programs. Therefore, Nauset made a decision to consolidate its Eastham facility with its new larger Hyannis facility in order to shift staffing to respond to the supported employment program. DeTucci and DMR were unaware of Nauset's plans.

On December 16, 1988, Jenkins held a meeting with clients' parents and told them of Nauset's plans. DeTucci and O'Meara were not invited to the meeting. Jenkins informed the parents that the facility in Eastham would be severely

curtailing its services and that clients would be moved to the facility in Hyannis or into community settings. Many of the parents were concerned about the proposed move.

On December 22, 1988, Jenkins wrote a letter to the clients' parents, expanding on the topics discussed at the meeting. In the letter, Jenkins stated that DMR had "mandated" a change from the sheltered workshop program to a supported employment program. The letter defined the meaning of the supported employment program and stated that Nauset, because of the lack of "new monies," had developed its own plan to handle the "mandated" conversion. Nauset planned to convert staff positions in the sheltered workshop program to the new program. Further, Nauset planned to transfer to the facility at Hyannis all the clients now at Eastham. Jenkins also enclosed a sample letter which concerned parents could send to public officials, including legislators, or to DMR about the proposed changes. A list of the names and addresses of the public officials and legislators was provided to the parents.

As a result of the letter, media attention was drawn to the proposed changes. DeTucci became angry with Jenkins because he believed that she had misrepresented DMR's position as to the proposed changes and also because DMR was not afforded an opportunity to address the matter prior to the letter being sent. DeTucci also believed that the proposed consolidation of the Eastham facility with Hyannis was an issue that should have been part of contract negotiations. O'Meara was not directly involved in this incident but was indirectly involved as DeTucci's supervisor.

On January 16, 1989, another meeting was held with parents, Nauset staff, DeTucci, and representatives of the Massachusetts Rehabilitation Commission. Jenkins was at that meeting. The consolidation was discussed, and DeTucci denied that he had ordered Nauset to "close" the Eastham facility.

The day after the meeting, Jenkins met with State Senator Henri Rauschenbach, Nauset officials, and DeTucci to discuss the parents' anger at the proposed changes. At the meeting, DeTucci denied that he had ordered the closing of Eastham or its consolidation with Hyannis. Jenkins agreed with DeTucci and stated that she believed that the decision to consolidate was necessary for Nauset to remain financially viable and that it was Nauset's decision to make.

The relationship between Jenkins and DMR further deteriorated in March of 1989. On March 1, 1989, one of Nauset's clients was diagnosed with measles. On March 3, having learned of the measles and concerned about a potential measles epidemic, a number of officials from DMR and the Department of Public Health (DPH) tried to reach Jenkins in an attempt to obtain client health records to determine who had been previously vaccinated and those who might be susceptible to catching the contagious disease. Neither Jenkins nor her assistant were at work that day. The administrator in charge that day was also out of the office. The officials were unable to obtain access to Nauset's records, despite their representation to a Nauset employee that this was a health emergency and that Nauset's refusal to comply would jeopardize its license. Nauset's administrative assistant finally reached Jenkins in the afternoon and informed her of the numerous calls from DMR and DPH regarding the possible measles outbreak. It was not until after 9 P.M. that evening that Jenkins finally called O'Meara. Earlier that day, DMR's chief of staff ordered an emergency suspension of Nauset's license because Nauset's "refusal to provide information and access to [DMR] and [DPH] and to cooperate with both [d]epartments with respect to the existence of a dangerous disease (measles), thereby endanger[ed] the life, safety, and health of clients or staff within its facility." A quarantine was imposed. It was lifted on March 20, 1989.

On March 9, 1989, after consultation with his supervisor and DMR's legal department, O'Meara presented a letter to Ted Southworth, the president of Nauset. The letter stated that DMR would not renew its contract with Nauset for fiscal year 1990. The reason for DMR's decision was its "recent experience concerning a possible measles outbreak in which the lack of cooperation of Nauset staff culminated [in] a situation endangering the life, safety, and health of clients within the agency and the general public." That experience, according to the letter, and Nauset's "unilateral approach . . . to close the Eastham workshop . . . led [O'Meara] to conclude that there ha[d] been no constructive change in the willingness of Nauset staff to work cooperatively with [DMR]."

After Nauset received the letter, its board of directors passed two resolutions (1) instructing Jenkins to meet with her staff and inform them specifically about the authority of

DPH to demand information and generally about the need to cooperate with supervisory authorities at all times, and (2) instructing Southworth to meet with DMR to "express the [board of directors'] regret[] about the friction that arose concerning the measles issue . . . during the absence of [Jenkins] and further to seek guidance from [DMR] in an attempt to comply with their directions more efficiently." Southworth met with O'Meara and DeTucci, and O'Meara agreed to hold his March 9 letter regarding next year's contract in abeyance.

On March 27, 1989, a meeting was held with O'Meara, DeTucci, Senator Rauschenbach, Southworth, and two other Nauset representatives. Southworth requested that DMR restore Nauset's funding for the next year. O'Meara stated that Nauset would not be granted the new contract if it continued with Jenkins as its executive director. On March 28, 1989, Southworth requested Jenkins' resignation, and she resigned. At the suggestion of O'Meara, one Richard Walker was appointed in her place. On April 5, 1989, DMR restored Nauset's license to operate. Jenkins then brought this action against DeTucci and O'Meara claiming improper interference with her employment contract.

To make out a claim of intentional interference with a contract, a "plaintiff must prove that: (1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *G.S. Enterprises, Inc.* v. *Falmouth Marine, Inc.*, 410 Mass. 262, 272 (1991). Both DeTucci and O'Meara agree that Jenkins had an employment contract with Nauset. O'Meara concedes that he interfered with that contract but claims he did not do so improperly. DeTucci denies that he interfered with the contract at all. DeTucci argues that, although he was present at the March 27 meeting where O'Meara notified Southworth that DMR's contract with Nauset would not be renewed if Jenkins continued as executive director, he said nothing regarding the situation. His mere presence at the meeting, he claims, is not enough to constitute interference. For the purposes of our analysis, we assume, without deciding, that DeTucci did interfere with Jenkins's employment contract. We rule, however, that O'Meara and DeTucci did not *improperly* interfere with the contract, and therefore, the

judge committed error in denying their motion for judgment notwithstanding the verdict.

We begin our analysis with a brief explanation of the relationship between DMR and Nauset. DMR is charged by the Legislature with the responsibility of taking "cognizance of all matters affecting the welfare of the mentally retarded citizens of the [C]ommonwealth." G. L. c. 19B, § 1, inserted by St. 1986, c. 599, § 9. Among other things, DMR is authorized to "enter into agreements with nonprofit charitable corporations, partnerships or collaboratives for the providing of mental retardation services." *Ibid.*

Once DMR enters into such an agreement and provides money to the private facility, it is entitled, in our view, to have the facility cooperate with it in order that DMR's mission of providing services to the mentally retarded is fulfilled. O'Meara's and DeTucci's function as representatives of DMR was to ensure that the various programs to help the mentally retarded were carried out by the private facility and also to make sure that the health and well-being of the clients were protected. With that as background, we now examine the various positions of the parties.

1. *Improper motive.* Jenkins claims that O'Meara's and De-Tucci's motive for interfering with her contract was improper because it was based on retaliation or ill will resulting from "strained relations." See *Draghetti* v. *Chmielewski*, 416 Mass. 808, 817 (1994). According to Jenkins, O'Meara and DeTucci perceived her as being a "problem" to them, and therefore, they decided to force her out of her job.

There were indeed strained relations between Jenkins and the DMR representatives, DeTucci and O'Meara. However, those relations developed as a result of the December 22 letter in which Jenkins falsely stated that DMR had "mandated" certain changes that were extremely unpopular with the clients' parents and as a result of the "measles" episode where Jenkins and her staff were uncooperative with representatives of DMR and DPH in their efforts to obtain records in order to react to a medical emergency. Thus, it was Jenkins's conduct which resulted in the strained relations. Compare *Draghetti* v. *Chmielewski*, *supra* at 817, where the strained relations were caused by the conduct of the defendant, not by the plaintiff, as here.

Taking into account the purpose of DMR as stated by the

Legislature, the relationship between DMR and Nauset, the duties assigned to DeTucci and O'Meara by DMR, and the conduct of Jenkins, we hold that there was no evidence that DeTucci and O'Meara *improperly* interfered with Jenkins's employment contract. Rather, the record demonstrates that DeTucci and O'Meara were fulfilling their obligation to take affirmative action to make sure that DMR's programs were advanced and that the clients' health and well-being were protected.

2. *Improper means.* Jenkins claims that DeTucci and O'Meara used improper means to interfere with her employment contract by (1) intervening directly with Nauset's board of directors and (2) allegedly misrepresenting information to Nauset about the measles incident.

O'Meara's decision to notify the board of directors about the nonrenewal of the contract did not constitute improper means. Utilizing such means was within O'Meara's authority and discretion, and certainly was within the legitimate interest of DMR. The board was the governing body of Nauset, and it was the logical entity for O'Meara to notify regarding DMR's decision.

Jenkins argues that instead of notifying the board, O'Meara should have talked with her about DMR's concerns. The evidence shows that DeTucci and O'Meara had informed Jenkins about their concerns in regard to her conduct toward DMR and its representatives. DeTucci was present with Jenkins at several meetings after the December 22 letter and had expressed his (and DMR's) displeasure with Jenkins's performance. Later, when Jenkins finally talked to O'Meara about the measles episode, Jenkins testified that O'Meara expressed anger and disappointment as to her and her staff's conduct during that emergency.

Jenkins's claim that DeTucci and O'Meara misrepresented information to Nauset is without merit. Misrepresentations of information may be considered to be "improper means" in the context of interference with contractual relations. See *Draghetti* v. *Chmielewski, supra* at 816-817 (police chief knowingly interfered with police officer's teaching contract by sending letter to police academy misstating that the officer had scheduling conflict between his responsibilities at the police department and the academy). Here, Jenkins claims that there was no evidence that she was uncooperative during the

measles episode and that the contents of DMR's March 9 letter to the board, stating that she was uncooperative, constituted misrepresentations. Contrary to Jenkins's claim, the letter did not state that Jenkins was uncooperative during the measles episode. It stated that her staff was uncooperative, a statement that is supported by the record. On this record, there were no misrepresentations in the letter.

In sum, we hold that DeTucci and O'Meara did not improperly interfere with Jenkins's employment contract. Because of our holding, we do not consider the issue whether the evidence was sufficient to defeat the defendants' common law immunity.

The order denying the defendants' motion for judgment notwithstanding the verdicts is vacated, and the case is remanded to the Superior Court where a judgment shall be entered in favor of the defendants.

*So ordered.*