Koenigs, J.
The plaintiff brokerage firm, Realty Systems Unlimited, Inc. (“Realty”), claims that a commission is due from the defendant, Regal-Beloit Corporation (“Beloit”), for the sale of real estate, on the ground that Realty was the efficient cause of a sale which occurred a year after the collapse of the sale it brokered for Beloit Beloit denies that the second sale was causally connected to Realty’s efforts in the first sale. Realty appeals from the allowance of the defendant’s motion for summary judgment pursuant to Dist/Mun. Cts. R A D. A, Rule 8C.
In Beloit’s motion for summary judgment and the supporting documents submitted pursuant to Mass. R Civ. R, Rule 56(c), Beloit asserts that Realty has no reasonable expectation of proving that Realty participated in the second sale on behalf of Beloit that Realty was the effective cause of the second sale, or that the brokerage agreement endured until the time of the second sale. Kourouvacilis v. General Motors Corp., 410 Mass. 706 (1991).
The following picture emerges from the undisputed facts submitted by the parties. Beloit[2] owned an industrial property in Worcester that it offered for sale in the early 1990s. The property had environmental problems implicating G.L.c. 21E. In November 1995, Realty[3] contacted Beloit and offered to make efforts to find a buyer for this property. Beloit agreed and the parties proceeded without a written brokerage contract[4] Shortly thereafter, Realty produced a potential buyer.
The buyer offered, through Realty, to purchase the property from Beloit for $500,000, subject to a 21E report, financing, and other contingencies. Beloit accepted the offer. Pursuant to the terms of the written agreement, the initial deposit of $1,000 was held by Realty, for Beloit, and Beloit held the additional deposit of $10,000.00.
After more than a year of negotiations, during which the deal nearly foundered, a more extensive purchase and sale agreement was signed in March 1997. A second buyer now joined the original buyer, and both signed the agreement
On the day the agreement was signed, Beloit sent a letter to Realty acknowledging the agreement to pay Realty, as “sole broker,” six percent of the purchase price at the closing. Beloit’s letter referenced the broker indemnification clause of the *226 purchase and sale agreement, which was attached. Realty’s president, Mr. Melvin Katz, signed the letter, agreeing with its terms.
Thereafter, the buyers encountered problems with financing and 21E environmental issues, of which they notified Beloit in June 1997. The deal sputtered on for six more months. Finally, in December 1997, the buyers again notified Beloit that they were unable to secure adequate financing. Beloit exercised its rights and withdrew from the contract, returning the deposit it held.
Upon the failure of the sale, Beloit sent a written notice to Realty that their brokerage agreement would end thirty days from the mailing of the notice,[5] and that it would assume that Realty agreed if there were no response within ten days. Realty did not respond to this letter.
Nearly a year later, in December 1998, the same buyers initiated direct contact with Beloit The buyers made another offer to buy the same property, and Beloit accepted. The agreed price was $475,000; the environmental concerns were dealt with differently. The parties expressly stated in the purchase and sale agreement that no broker was involved.
Beloit wrote to Realty shortly thereafter complaining that Realty had been entering the property, using the key provided in 1995, without Beloit’s knowledge or authorization. Beloit demanded that Realty return the key and cease entering the property.
Realty responded that it did not have the key, and that it expected its broker’s fee at the closing. Beloit refused to pay; Realty subsequently sued for a brokerage fee.
Realty is entitled to a broker’s fee if it had a binding contract with Beloit to produce a buyer who was ready, willing, and able to buy on the terms fixed by Beloit, produced such a buyer, and the transaction is completed by closing the tide. Tristam’s Landing, Inc. v. Wait, 367 Mass. 622 (1975). Realty, as the plaintiff, bears the burden of proving it was the real, predominating and efficient cause of the sale. Bonin v. Chestnut Towers Realty Corp., 392 Mass. 58 (1984); Kacavas v. Diamond, 303 Mass. 88 (1939).
Beloit’s 56(c) materials establish that, shortly after the collapse of the first deal in 1997, its business relationship with Realty was terminated in writing, and never resumed in any form. Beloit asserts that the later sale was the result of a fresh start by the buyers long after the Realty-Beloit brokerage agreement ended.
The plaintiff’s countervailing affidavit contains several allegations that bear close scrutiny. Realty states that after the 1997 sale collapsed, it continued working to resuscitate the deal by showing the property, as the buyers’ broker, to prospective condominium owners.[6] Realty contends that these efforts promoted the likelihood of a successful sale, because the buyers’ ability to obtain financing was improved by the likelihood of subsequent condominium sales. Realty’s affidavit does not allege that it ever notified Beloit of this new brokerage relationship between Realty and the buyers.[7]
Realty’s affidavit further states that Beloifs vice president, Scott Schneier, “was always aware that [Realty] maintained a continuing involvement with the property.” *227 The affidavit alleges no specific facts from which Mr. Schneier's knowledge, or acquiescence, could be inferred. A conclusory allegation does not raise a triable issue of fact See Lewis v. Antelman, 10 Mass. App. Ct. 221 (1980); O’Brion, Russell & Co. v. LeMay, 370 Mass. 243 (1976); Community NaT'l Bank v. Dawes, 369 Mass. 550 (1976).
It is not disputed that Beloit gave a key to Realty, at some point for the purpose of showing the property. Realty’s statement that it obtained a key to the property to show it to prospective tenants and buyers is devoid of any mention of time, and thus raises no genuine issue of material fact as to Beloit’s knowledge of Realty’s post-1997 activities at the property. Similarly, the assertion that Realty was to be named in the purchase and sale agreement fails to mention when this happened; it is not disputed that Realty was in fact named as broker — in the March 1997 agreement The fact that the initial $1,000 deposit went unclaimed after the termination of the first contract does not establish an ongoing brokerage agreement
The contention that Beloit acted in bad faith is not established for the purposes of defeating a summary judgment motion by asserting, without more, that the same parties reached an agreement a year later for the sale of the same property on similar terms. Realty’s affidavit states no facts from which a trier of fact could find that Beloit continued negotiations with the buyers after terminating the March 1997 sale, with the intention of depriving Realty of a commission. Contrast McAvoy v. Ginsberg, 345 Mass. 733 (1963).
The Beloit-Realty brokerage agreement contemplated a definite result, i.e., the sale of the property, and must be deemed to have endured for a reasonable time, given the nature of the contract, the probable intentions of the parties, and the attendant circumstances. Alexander v. Berman, 29 Mass. App. Ct. 458 (1990); Plymouth Port, Inc. v. Smith, 26 Mass App. Ct. 572 (1988), further appellate review denied, Plymouth Port, Inc. v. Smith, 403 Mass. 1106 (1988).
Realty has faled to establish by any specific facts that the parties intended to extend their brokerage agreement past the time limitations in the December 1997 termination letter, or that Realty thereafter acted on Beloit’s behalf to close the sale.
Beloit, as the party moving for summary judgment against the party who has the burden of proof at trial, is entitled to summary judgment if it has demonstrated, by reference to the 56(c) materials, unmet by opposing materials, that Realty has no reasonable expectation of proving an essential element of its case. Kourouvacilis v. General Motors Corp., supra at 716. Viewing the plaintiffs affidavits in the light most favorable to it, Hub Associates, Inc. v. Goode, 357 Mass. 449, 451 (1970), we have concluded that on the record before the judge there is no genuine issue regarding the existence of an ongoing contractual relationship or obligation on Beloit’s part to pay a brokerage fee to Realty. Bonin v. Chestnut Hill Towers Realty Corp., 392 Mass. 58 (1984); Holden v. Shepard, 291 Mass. 513 (1935). The defendant was therefore entitled to judgment as a matter of law. Mass. R Civ. P., Rule 56(c), 365 Mass. 824 (1974).
The judge’s allowance of the motion for summary judgment was correct.
Judgment affirmed.

 At all times pertinent to this case, Beloit’s vice president, Mr. Scott Schneier, acted for Beloit

 At all times pertinent to this case, Realty’s president Mr. Melvin Katz, acted for Realty.

 The agreement did not encompass a sale of a business, and therefore the requirement that the parties’ agreement be in writing, see G.L.c. 259, §7, does not apply.

 No mention of the $1,000 deposit is made in this notice, or of the key to the property that had been given to the plaintiff.

 The buyers’ ultimate plan for the property was to turn the property into condominiums. Realty gained access to the premises as the buyers’ broker by using the key and access code provided by Beloit at the outset of their business relationship in 1995.

 Predictably, Beloit takes the considerably dimmer view that if Realty acted as broker for both parties at the same time, Realty breached its duty of fidelity and thereby forfeits any right to recover a broker's fee. Friedman v. Ballard, 250 Mass. 167 (1924); Libby v. Smith, 293 Mass. 465 (1936).